# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>            **Plaintiff,**<br><br>      **v.**<br><br>**J.P. MORGAN SECURITIES LLC, EMC MORTGAGE, LLC, BEAR STEARNS ASSET BACKED SECURITIES I, LLC, STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., SACO I, INC., AND J.P. MORGAN ACCEPTANCE CORPORATION I,**<br><br>            **Defendants.** | **COMPLAINT**<br><br>**Civil Action No.**<br><br>**ECF CASE** |

Plaintiff United States Securities and Exchange Commission ("Commission") makes the following allegations against Defendants J.P. Morgan Securities LLC (or "JP Morgan"), EMC Mortgage, LLC (or "EMC"), Bear Stearns Asset Backed Securities I, LLC (or "BSABS"), Structured Asset Mortgage Investments II, Inc. (or "SAMI"), SACO I, Inc. (or "SACO"), and J.P. Morgan Acceptance Corporation I (or "JPMAC").

## SUMMARY

1.    This case concerns violations of the federal securities laws by entities affiliated with The Bear Stearns Companies, LLC (collectively "Bear"), JP Morgan, and JPMAC in connection with billions of dollars of offerings of residential mortgage-backed securities ("RMBS") collateralized largely by sub-prime mortgage loans.  The violations resulted from (a) Bear's undisclosed practice, in connection with RMBS offerings, of negotiating cash settlements with mortgage loan originators on loans that violated the representations, warranties, and covenants made to Bear by the originators after the loans were securitized but keeping the consideration received without notifying the trusts that owned the loans and (b) the inclusion of delinquent loans in a December 2006, $1.8 billion RMBS offering that was underwritten by JP Morgan and collateralized by loans that JPMAC had purchased from WMC Mortgage Corporation (or "WMC").

2.    The conduct involving Bear began in or about 2005.  When structuring RMBS transactions, Bear purchased loans from several different originators.  At the time Bear purchased the loans, the originators typically agreed to repurchase any loan that missed a payment within the first three months ("early payment default" loans or "EPD"), and made other representations and warranties about the loans.  Often, Bear sold these loans to RMBS trusts prior to the end of the EPD period.  When loans that Bear had purchased missed one or more

payments within this period, or Bear discovered other breaches of an originator's representations and warranties, Bear made claims against the originator, demanding that the originator repurchase the loans and promising to deliver the loans back to the originator upon receipt of the repurchase price. Bear made these claims regardless of whether it had already securitized the loans. When the originator agreed to repurchase securitized loans, Bear repurchased them from the trusts, and the trusts were made whole. However, as originators began to experience financial problems, Bear often instead negotiated a discounted cash settlement (referred to as a "bulk settlement" because the settlements typically included many different loans) with the originator in lieu of a repurchase, in many instances did not contribute the money to the trusts, and left the loans underlying the settlement in the RMBS trusts. In addition, although Bear assessed settlement loans to determine whether they breached the separate representations and warranties that Bear made to the trusts, Bear was less likely to repurchase these bulk settlement loans from RMBS trusts than loans that originators had agreed to repurchase.

3.      Certain disclosures in the Bear RMBS offering documents, which included registration statements, prospectuses and Pooling and Servicing Agreements attached to Forms 8-K filed with the Commission, led investors to believe that, among other things, Bear would repurchase loans from the trusts to enforce rights against originators with respect to the loans it was selling to the RMBS trusts. These disclosures were rendered misleading by the failure to disclose the bulk settlement practice.

4.      Bear never informed the trusts about the bulk settlement practice, and failed to disclose it in offering documents and other public documents, despite a duty to do so.

5.      Bear entered into bulk settlements involving approximately 6,535 trust-owned loans spread across 156 different RMBS trusts (the "Bulk Settlement RMBS"), and repurchased a total of only approximately 13.5% of these loans, leaving the remainder in the trusts.

6.      The conduct involving JP Morgan and JPMAC took place in or about December 2006.  JP Morgan and JPMAC structured a transaction in which a trust known as J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 was created and issued RMBS that had as collateral more than 9,000 sub-prime mortgage loans that WMC had originated or acquired (the "WMC4 transaction").  JP Morgan and JPMAC offered the RMBS largely through a prospectus supplement filed with the Commission and a private placement memorandum to which the prospectus supplement was attached.  In the prospectus supplement, JP Morgan and JPMAC made materially false and misleading statements concerning the amount of, and extent to which, loans were and had been delinquent.  As a result of the sale of delinquent loans to J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, investors in the WMC4 transaction suffered substantial losses.

7.      In the prospectus supplement for the WMC4 transaction, JP Morgan and JPMAC made representations concerning the amount of mortgage loans that, as of the close of business on December 1, 2006, known as the "cut-off date," were thirty or more days delinquent (also referred to herein as "current delinquencies") and concerning the amount of mortgage loans that had been thirty or more days delinquent in the twelve-month period ended as of the cut-off date (also referred to herein as "historical delinquencies").  With respect to current and historical delinquencies, JP Morgan and JPMAC represented that .04%, or 4, of the loans were the only loans that had had an instance of delinquency.

8.      While JP Morgan and JPMAC personnel were preparing the prospectus supplement for the WMC4 transaction, they had information that more than 7% of the loans, with a balance of more than $135 million, were at least 30 days delinquent.  That information showed, among other things, that as of the cut-off date, (a) more than 7% of the mortgage loans that provided the collateral for the transaction, which was more than 620 loans, were at least 30 days delinquent; (b) .04% of the loans were 60 – 89 days delinquent; (c) more than 620 loans had experienced instances of delinquency of 30 – 59 days in the preceding twelve months; and (d) 4 loans, representing .04% of the loans, had experienced instances of delinquency of 60 – 89 days in the preceding twelve months.  Information about delinquent loans was information that investors would have considered important in deciding whether to invest in the WMC4 transaction.  The undisclosed delinquent loans that remained as collateral for the transaction have had or are projected to have total losses of at least $37 million.  JP Morgan and JPMAC knew or should have known that the disclosures concerning delinquent loans were materially inaccurate and would mislead purchasers of the securities offered and sold in the WMC4 transaction.

9.      By their conduct, Defendants each violated section 17(a)(2), (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)(2), (3)].

10.     As a result of Defendants' conduct, the Commission seeks entry of a final judgment ordering injunctive relief, ordering the payment of disgorgement and pre-judgment interest, and imposing civil penalties.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to sections 20(b) and (d) and 22(a) of the Securities Act [15 U.S.C. §§77t(b), (d), 77v(a)].  Defendants transacted business related to the bulk settlements and the WMC4 transaction in this judicial district and, directly or

indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in connection with transactions, acts, practices and courses of business alleged in this Complaint.

12.     Venue in this Court is proper under section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and sections 21(d)(1) and 27(a) of the Exchange Act [15 U.S.C. §§78u(d)(1), 78aa(a)] because certain of the acts, practices, and courses of business related to the bulk settlements and the WMC4 transaction alleged in this Complaint took place in this judicial district.

## DEFENDANTS

13.     **J.P. Morgan Securities LLC**, known as J.P. Morgan Securities Inc. during the time relevant to this Complaint, is a Delaware limited liability company with its principal executive offices in New York, New York.  JP Morgan is a registered broker-dealer under the Securities Exchange Act of 1934 and a registered investment adviser under the Investment Advisers Act of 1940.  During the relevant time, it was a subsidiary of JPMorgan Securities Holdings LLC, which, in turn, was a subsidiary of JPMorgan Chase & Co. ("JPM Chase"), a financial services holding company.  JP Morgan was, and remains, the principal nonbank subsidiary of JPM and served as the underwriter for the WMC4 transaction.  In addition, in October 2008, JP Morgan became the successor by merger to former registered broker-dealer Bear Stearns & Co., Inc. ("Bear Brokerage").  Prior to the merger, Bear Brokerage was wholly owned by The Bear Stearns Companies, Inc., now The Bear Stearns Companies, LLC ("Bear Parent").  The merger of JP Morgan and Bear Parent became effective as of September 2008. Prior to the time it became part of JP Morgan, Bear Brokerage acted as underwriter for 156 of the Bulk Settlement RMBS.  In that capacity, Bear Brokerage acquired the securities issued by the RMBS trusts and sold them to investors.  Bear Brokerage's formal role with respect to the

offer and sale of RMBS was as underwriter, but the individuals who acted on behalf of the depositors (defined below) in the RMBS transactions were employees of Bear Brokerage. These same individuals at Bear Brokerage directly supervised and controlled the activities of the sponsor and its employees.

14.     **EMC Mortgage, LLC** is a Delaware limited liability company, formerly headquartered in Lewisville, Texas.  EMC is and, at the times relevant to this Complaint, was a wholly owned subsidiary of Bear Parent, which is now a wholly owned subsidiary of JPM Chase.  Prior to the time it came to be owned by JPM Chase, EMC acted as the sponsor of the Bulk Settlement RMBS.  As sponsor, EMC purchased mortgage loans from loan originators and other loan sellers, sold the loans to affiliated depositor entities for resale to RMBS trusts, and entered into the bulk settlement agreements set forth herein. EMC was also a loan servicer, and acted as a servicer for many of the RMBS trusts affected by the bulk settlement practice.

15.     **Bear Stearns Asset Backed Securities I, LLC** is a Delaware limited liability company with headquarters in New York, New York.  BSABS is and, at the times relevant to this Complaint, was a wholly owned subsidiary of Bear Parent, which is now a wholly owned subsidiary of JPM Chase.  Prior to the time it came to be owned by JPM Chase, BSABS acted as the depositor for 104 of the Bulk Settlement RMBS.  BSABS acquired mortgage loans from the sponsor, EMC, and sold them to the RMBS trusts pursuant to Pooling and Servicing Agreements ("PSAs").  Other than briefly holding title to the mortgage loans before conveying them to RMBS trusts, BSABS did not hold assets, and it did not conduct any other business.  BSABS had no separate employees, and its officers and directors were employees of Bear Brokerage. BSABS filed documents with the Commission concerning the RMBS, including Form S-3 registration statements, prospectus supplements, and Forms 8-K containing or attaching PSAs.

16.     **Structured Asset Mortgage Investments II, Inc.**, is a Delaware corporation with headquarters in New York, New York.  SAMI is and, at the times relevant to this Complaint, was a wholly owned subsidiary of Bear Parent, which is now a wholly owned subsidiary of JPM Chase.  Prior to the time it came to be owned by JPM Chase, SAMI acted as the depositor for 46 of the Bulk Settlement RMBS.  SAMI acquired mortgage loans from the sponsor, EMC, and sold them to the trusts pursuant to PSAs.  Other than briefly holding title to the mortgage loans between the sponsor and the trusts, SAMI did not hold assets, and it did not conduct any other business.  SAMI filed documents with the Commission concerning the RMBS, including Form S-3 registration statements, prospectus supplements, and Forms 8-K containing or attaching PSAs.  SAMI and BSABS are the depositors for all of the 150 public Bulk Settlement RMBS; they are referred to herein collectively as the "Bear Registrant Depositors."

17.     **SACO I, Inc.** is a Delaware corporation with headquarters in New York, New York.  SACO is and, at the times relevant to this Complaint, was a wholly owned subsidiary of Bear Parent, which is now a wholly owned subsidiary of JPM Chase.  Prior to the time it came to be owned by JPM Chase, SACO acted as the depositor for the six private RMBS transactions at issues in this case.  SACO acquired mortgage loans from the sponsor, EMC, and sold them to the trusts pursuant to PSAs.  SACO and the Bear Registrant Depositors are referred to herein collectively as the "Bear Depositors."

18.     **J.P. Morgan Acceptance Corporation I** is a Delaware corporation with its principal place of business in New York, New York.  It is, and, at the times relevant to this Complaint, was, a subsidiary of JPMorgan Securities Holdings LLC.  JPMAC was the depositor for the WMC4 transaction.  As the depositor, JPMAC was the registrant and issuer for the

WMC4 transaction.  The prospectus supplement for that transaction became part of a registration statement for RMBS offerings that JPMAC previously had filed with the Commission.

**RELEVANT ENTITY**

19.    **WMC Mortgage Corporation** was a California corporation with its headquarters in Burbank, California.  WMC was purchased by a subsidiary of the General Electric Company in June 2004 and primarily originated sub-prime loans.  By the end of the second quarter or 2007, WMC substantially had ceased originating loans.

**FACTS**

20.    EMC, BSABS, SAMI, SACO, and Bear Brokerage, prior to the merger with JP Morgan, engaged in the conduct that resulted in the violations related to the bulk settlements.  JP Morgan and JPMAC engaged in the conduct that gave rise to the violations related to the delinquent loans in the WMC4 transaction.

**The Transactions Involving Bulk Settlements**

21.    Bear began the bulk settlement practice in or about 2004.  The Bulk Settlement RMBS transactions at issue in this case occurred from early 2005 through late 2007, prior to the JPM Chase merger.

**Overview of Bear's RMBS Securitization Process**

22.    Bear's RMBS securitization process was handled and/or overseen by employees of Bear Brokerage. The most senior officers at the sponsor entity EMC reported to the co-heads of Bear Brokerage's Mortgage Finance Department, who reported to the former Global Head of Mortgage and Asset Backed Securities at Bear Brokerage (the "Global Head").  The RMBS business was structured generally as set forth below.

8

23.     EMC purchased home mortgage loans from loan originators throughout the United States that had entered into mortgage transactions with homeowners.  The originators conveyed the loans to EMC through Mortgage Loan Purchase Agreements ("Originator MLPAs").  The Originator MLPAs contained various representations and warranties from the originators related to the loans, such as, for example, that certain loan underwriting guidelines had been met.  The originators were required to repurchase loans that breached such representations.  The Originator MLPAs also usually included EPD protection whereby the originators agreed to repurchase loans for which the borrower missed any one of the first three payments due.

24.     The Mortgage Finance Department at Bear Brokerage then grouped these newly purchased loans from the various originators into pools ranging in size from as few as 500 to over 10,000 loans, and sold each pool to an intermediate entity known as the "depositor."  This intermediate entity (one of the Bear Depositors) was wholly owned by Bear Parent, but had no separate employees or operations.  Its officers and directors were employees of Bear Brokerage. EMC conveyed all of its right, title and interest in the pool of loans to the depositor through a second MLPA (the "Sponsor MLPA").  The Sponsor MLPAs also contained various representations and warranties from EMC to the depositor, but generally fewer than those EMC had received from originators.  EMC did not provide EPD protection to the depositor in the Sponsor MLPAs.

25.     The depositor then conveyed the pool of loans to a newly created and separately named RMBS trust through the PSA created for that specific trust.  In the PSA, the depositor assigned "all of its right, title and interest" in the loans, as well as "all proceeds" from the loans, to the trust.  The depositor also assigned its rights under the Sponsor MLPA (usually attached as

an exhibit to the PSA), which included the representations and warranties of EMC.  The trust, using Bear Brokerage as underwriter, then sold securities backed by the loans to investors.  The investors in RMBS were, for the most part, institutional investors such as hedge funds, banks, pension funds, credit unions, and mutual funds.

      26.    The diagram below sets forth the flow of loans and other rights among the above-mentioned parties:



      27.    The loans were passed to the trusts through a depositor entity to ensure that the trust assets were "bankruptcy remote," and thus could not be encumbered by Bear's creditors.  They were also structured in this way to qualify as Real Estate Mortgage Investment Conduits ("REMICs").  REMICs pay no tax at the entity level.  To qualify for this treatment, REMICs must, among other things, be passively managed.  Accordingly, sponsors and depositors are generally prohibited from managing the activity of the trusts, and accounting rules require that the sponsor relinquish effective control of the loans.

28.     RMBS transactions also involved "servicer" entities, which were paid fees based on collections from borrowers.  The same entity that acted as the securitization sponsor (EMC) typically also serviced some or all of the loans in the relevant transactions.  As servicer, EMC, among other things, collected loan payments from the borrowers and handled matters such as escrow and tax payments on the loans.  EMC passed the borrower payments to the trusts, and then a trustee distributed monthly payments to the RMBS investors in accordance with very detailed and specific parameters disclosed in the offering documents and known as a "waterfall." If and when borrowers defaulted on their payments, EMC instituted foreclosure proceedings, and then passed foreclosure recoveries to the trusts. These recoveries were also distributed to investors monthly in accordance with the waterfall.

### The Offering Documents

29.     Bear Brokerage's Mortgage Finance Department, with assistance from internal and external counsel, handled the process of preparing and filing the documents required for an RMBS securitization.  Each public transaction involved filing numerous documents with the Commission.  The three central documents in each transaction were a shelf registration on Form S-3, a prospectus supplement, and a PSA.

a.     The S-3.  During the relevant time period, each of the Bear Registrant Depositors had an active shelf registration on Form S-3 on file with the Commission. Each of the Forms S-3 (as amended) contained, among other things, a form prospectus describing in relatively broad terms the securities to be issued from that shelf, the general structure of the RMBS transactions to follow, risk factors, etc. The Forms S-3 were signed by officers and directors of the Bear Registrant Depositors, including the Global Head, who were employees of Bear Brokerage.

b.      The Prospectus Supplement.  With each individual RMBS transaction, the

depositor filed a number of additional documents with the Commission in the name of the

specific RMBS trust.  These transaction-specific documents included, among others, a

prospectus supplement and a PSA.  The prospectus supplements included much of the

same language that appeared in the S-3 form prospectus, but then also described the

particulars of the new transaction in detail.  For example, they included the amount and

structure of the securities being offered, the number and characteristics of the loans

backing the securities, and the waterfall for payments to the holders of the securities.  The

prospectus supplements were not separately signed, but they became a part of the

previously filed and signed Form S-3.

c.      The PSA.  The PSA was filed either within or as an exhibit to a Form 8-K.

PSAs generally set forth the roles, responsibilities, rights and obligations of the sponsor,

the depositor, the servicer, and the trustee, and were signed by officers of each of these

parties.  The PSA conveyed the loans to the trust and set forth representations and

warranties of the sponsor, EMC.  Employees in Bear Brokerage's Mortgage Finance

Department generally signed the PSAs on behalf of EMC as sponsor, and, when EMC

was a servicer, employees of EMC signed in that capacity.

30.     For the six private transactions at issue, there was a Private Placement

Memorandum and a PSA which included similar types of information.

**Bear Made Claims Against Originators to Repurchase Defective Loans**

31.     Throughout the relevant timeframe, EMC performed monthly "quality control"

reviews on a sample of its newly purchased loans, usually around 10% of the purchases for the

month.  The quality control review involved an analysis of the documentation in the loan file

12

(e.g., the appraisal, the loan application, borrower financial information, required disclosures, etc.) to determine whether the loans breached any representations or warranties in the Originator MLPAs.  EMC also closely monitored all loans, not just a sample, for EPDs.  When EMC identified a representation or warranty breach during quality control, or an EPD occurred, EMC contacted the originator and demanded that the originator repurchase the loan pursuant to the Originator MLPA.  EMC's demands set forth the repurchase price, and EMC generally promised that, upon receiving this amount, it would deliver the loan back to the originator.  EMC made these demands, most of which arose from EPDs, regardless of whether it had possession of the loans in its inventory or whether it had already sold the loans to an RMBS trust.

32.     When an originator agreed to repurchase an inventory loan, EMC simply conveyed the loan back to the originator in exchange for the repurchase price specified in the Originator MLPA.  However, when an originator agreed to repurchase a trust-owned loan, EMC had to first repurchase the loan from the trust in order to deliver it back to the originator.  Most of EMC's repurchase demands against originators were for EPDs.  EMC took the position that it had not passed EPD protection from originators through to the trusts and that it needed to find a breach of a representation or warranty in the Sponsor MLPA in order to remove the loans from the trust.  To accomplish this, EMC then performed a second loan file review, called a "PSA breach review," to identify a breach of one of EMC's representations or warranties in the Sponsor MLPA.  EMC found a PSA breach on these loans slated for repurchase nearly 100% of the time.

**Bear Changed Its Practice and Began to Accept
Bulk Settlements in Lieu of Repurchases From Originators**

33.     As the housing market began to decline, and borrower defaults began to increase, originators experienced financial difficulties and became less willing and able to honor the

growing number of repurchase demands made by EMC and other firms.  EMC devised the bulk

settlement practice as a means to address this problem.

34.     Thereafter, EMC began negotiating settlements, for cash and other consideration,

from loan originators in lieu of the originators' repurchase of the defective loans.  The

settlements varied somewhat, but generally included a release by EMC of its repurchase claims

on a specific population of loans.  In exchange for EMC's release, the originator generally

agreed to pay some cash amount representing a fraction of the total claim amounts listed in the

agreement.  The fractional amounts recovered spanned a wide range from just pennies on the

dollar to as high as 90%.  The settlements did not release Bear from any of its obligations to the

trusts.

35.     The settlements were based on loans that EMC maintained in its inventory and on

loans that had already been securitized and sold to RMBS trusts.  The settlement agreements did

not generally address whether EMC owned the relevant loans nor make any distinction about the

treatment of settlement proceeds based on securitized loans.  EMC, after generally reviewing

those loans for possible repurchase, left most of the trust-owned bulk settlement loans in the

trusts, and at no time notified the trusts of the settlements it had negotiated based on their loans.

**Bear Senior Management Approved the Bulk Settlement Practice**

36.     Sometime in early 2006, the bulk settlement practice came to the Global Head's

attention, who sought more information from EMC regarding the amount of, and procedures

related to, the bulk settlements on trust-owned loans.

37.     Deliberations about how to deal with the bulk settlements involving counsel and

Bear executives continued for many months through the end of 2006 and into early 2007, during

which time certain of the funds were held in a separate account.  By the end of February 2007,

Bear decided that the practice would continue, that certain funds collected to date would be taken into income for first quarter 2007, and that future settlement funds would be allocated pursuant to a procedure that was yet to be devised, and which eventually became known as the "Settlement Waterfall."

### Bear Purported to Redirect Some Bulk Settlement Funds to the Trusts

38.    The Settlement Waterfall, created with the involvement of counsel, is an eight-page document setting forth in detail how incoming bulk settlement funds were to be allocated.

39.    Under this allocation, Bear first reimbursed itself for legal fees, costs and other expenses; second, it covered the full amount of certain "monetary" claims (such as, e.g., tax and escrow adjustments); and third, it divided any remaining funds pro-rata between inventory and trust-owned loans.  Bear then used the pro-rata amount allocated to trust-owned loans to reimburse itself for its repurchases of all bulk settlement loans that EMC deemed "mandatory" because the representations and warranties to the trusts had been breached on these loans. Finally, if any funds remained after all of the above allocations, EMC would use the money for repurchases that EMC deemed "optional," both of bulk settlement loans and of other loans from securitizations.

40.    Only this last allocation could provide a benefit to the trusts (to which they were not already entitled) arising from Bear's receipt of bulk settlement funds.  This allocation contemplated the "optional" repurchase of a defective loan that, at least according to EMC's internal analysis, did not actually breach any EMC representations to the trust, but were eligible for repurchase under certain optional repurchase provisions included in Bear securitizations. EMC "optionally" repurchased only 44 bulk settlement loans pursuant to the Settlement

Waterfall, and used most of this "optional" allocation to repurchase loans that were not included in bulk settlements, but that were part of securitizations, which contained bulk settlement loans.

### Bear Avoided Significant Losses Because of
### How It Analyzed Its Breaches On Bulk Settlement Loans

41.     To implement the allocation specified in the Settlement Waterfall, EMC began performing a PSA breach review on bulk settlement loans to determine whether there was a breach of a representation or warranty made by EMC to the trust.  Prior to this time, when EMC conducted the PSA breach review on loans that a loan originator had agreed to repurchase, EMC found a breach nearly 100% of the time.

42.     However, with regard to bulk settlement loans, EMC did not find a breach on every loan.

43.     In a July 2007 e-mail, the head of EMC's Quality Control Department confirmed an understanding of the differing approaches, pointing out that, if an EPD loan was not to be repurchased by an originator, then "we don't want to find a PSA breach . . ."  Thus, certain EMC employees believed that EMC did not "want to find" PSA breaches on bulk settlement loans.

44.     When reviewing bulk settlement loans, EMC found that only about 12.7% of the bulk settlement loans breached its representations and warranties in the Sponsor MLPA.

45.     The allocation specified in the Settlement Waterfall was halted in or around the spring of 2008, and certain of the funds collected remained in a separate account.

## Scope of Bulk Settlement Conduct

46.     The bulk settlements began as early as 2004, with most of the conduct occurring in 2006 and 2007.  EMC ultimately entered into bulk settlements with face amounts totaling approximately $303 million.  These bulk settlements involved loans within 156 RMBS trusts issued in 2005 through 2007.

47.     The bulk settlements covered as many as roughly 9,000 loans, both in inventory and securitizations, and settled both repurchase and "monetary" claims.  Of the repurchase claims, approximately 6,535 covered trust-owned loans, and EMC eventually repurchased a total of approximately 880 of these loans, leaving about 5,655 bulk settlement loans in the trusts.

## Bear Made Materially Misleading
## Statements and Omissions in RMBS Offering Documents

48.     Bear did not disclose to investors, and investors in Bear RMBS were not aware of the bulk settlement practice or that Bear had received and kept funds from loan originators on trust-owned EPD loans.

49.     The Bear entities failed to disclose the bulk settlement practice in any of the documents provided to investors or filed with the Commission relating to the Bulk Settlement RMBS.  Instead, these entities made materially misleading statements and omissions relating to certain aspects of the securitizations, and also failed to disclose certain information required under subpart 1100 of Commission regulation S-K [17 C.F.R. §§ 229.1100-.1123] related to asset-backed securities offerings and referred to as regulation AB.

50.     The bulk settlement practice was inconsistent with fundamental principles underlying RMBS transactions – that it was in the interest of all parties that the loans perform well.  In addition, the trusts did not receive disbursement of collected proceeds and defective loans were not removed from the trusts.

51.     The offering documents frequently disclosed the existence of Bear's rights against originators, and the link between the exercise of those rights and repurchases out of the trust. However, they did not disclose that Bear might exercise these rights, and keep or set aside the proceeds therefrom, without repurchasing the loans.  For example, in February of 2007, Bear amended the Form S-3 for one of the Bear Registrant Depositors, SAMI, to include the following language:

> "The inability [of loan originators] to repurchase [EPD] loans may also affect the performance of any securities backed by those loans."

As of March 1, 2007, Bear added the following language to its prospectus supplements and PSAs:

> " . . . the Sponsor may, at its option, purchase any mortgage loan from the issuing entity for which the first scheduled payment due to the Issuing Entity after the Closing Date becomes 30 days past due; provided however, such  mortgage loan was purchased by the Sponsor (or one of its affiliates) from an originator pursuant to a loan purchase agreement which obligated such originator to repurchase such mortgage loan if one or more scheduled payments becomes 30 or more days delinquent (and such originator has agreed to repurchase such mortgage loan)."

52.     In addition, registration statements, prospectus supplements and PSAs represented that the sponsor and depositor would or had transferred all "right, title and interest" in the loans, as well as all "proceeds" from the loans into the trusts.

53.     Bear did not disclose that, despite this transfer, Bear enforced rights against originators for loans owned by the trusts without repurchasing them.

54.     Bear affirmatively misstated, and sometimes failed to make, the required disclosures under item 1119(c) of regulation AB, which requires disclosure of relationships involving or relating to the pool assets between the sponsor and originators of more than 10% of the pool assets.  By virtue of its practice of making claims against originators on trust-owned assets, Bear maintained a relationship with originators relating to the pool assets.  To the extent that Bear had such a relationship with originators of 10% or more of the trust assets, that relationship was required to be disclosed.

55.     Item 1104(c) of regulation AB requires disclosure of "information or factors related to the sponsor that may be material to an analysis of the origination or performance of the pool assets."  The bulk settlement practice was relevant to the origination of loans because Bear collected additional funds on EPD loans sold to RMBS trusts.  Yet, the practice was not disclosed.

56.     Bear also disclosed only a portion of the truth with respect to EMC's own repurchase obligations.  Items 1111(e) and 1111(g) of regulation AB require disclosure of "representations and warranties made concerning the pool assets" and the remedies available for breaches of those representations and warranties, as well as a description of the "circumstances" under which "pool assets may be . . . removed from the asset pool, such as [for] a breach of a pool asset representation or warranty."  The PSAs signed by the Bear Depositors and EMC described the remedies available to the trusts for breaches of representations and warranties by the sponsor.  However, there was no disclosure that Bear would exercise its rights against originators, without repurchasing the loans.  In fact, the repurchase remedy generally was not available because Bear infrequently found breaches of its representations and warranties on bulk settlement loans.

**Bear Misled Purchasers of RMBS Securities through a
Number of Undisclosed Bulk Settlement Acts and Practices**

57.     The bulk settlement practice involved a number of undisclosed acts that misled

RMBS investors.  These acts included, but were not limited to: (1) Settling repurchase claims

against originators on trust-owned loans, and keeping certain of the proceeds received, when

Bear did not repurchase the loans from the trusts; (2) Applying standards for repurchase of loans,

which resulted in a nearly 100% breach rate for loans that an originator had agreed to repurchase,

but only a 12.7% breach rate for bulk settlement loans; (3)  Failing to disclose the bulk

settlement practice when answering questions about EPDs posed by certain investors; and (4)

Failing to notify investors about the proceeds Bear retained related to securitized loans, despite

knowing that investors were unaware of the bulk settlement practice.

**Bear's Misleading Statements,
Omissions, and Conduct Violated the Federal Securities Laws**

58.     The bulk settlement practice would have been material to investors' decisions

whether to invest in Bear's securities offerings, because, among other things, Bear was collecting

money that was not disbursed to the trusts for trust-owned loans that defaulted early; and these

early defaulting bulk settlement loans, unlike originator-repurchased loans, were frequently not

repurchased.  In addition, the practice on a platform level generated tens of millions of dollars,

which was not passed on to investors.

59.     The Bear Registrant Depositors, EMC, and Bear Brokerage are all primarily liable

for the misstatements and omissions in the offering documents for the public transactions.  The

Bear Registrant Depositors signed the Form S-3 Registration Statements as issuers for the

securities and were also responsible for the content of the prospectus supplements, which were

incorporated into the prospectuses that were part of the Registration Statements.  Both the Bear

Registrant Depositors and EMC, as sponsor, signed and filed the PSAs.  Bear Brokerage's name

appeared on the securitization documents as the underwriter, and its employees were the officers

of the Bear Registrant Depositors who prepared and signed the offering documents.  EMC and

Bear Brokerage were also instrumental in preparing all of the offering documents and managing

the bulk settlement process.  Moreover, all of the officers of the Bear Depositors were employees

of Bear Brokerage.  Each of these entities also participated in the acts described in paragraph 57

above.

60.     The Bear Depositors, EMC, and Bear Brokerage were themselves conducting the

bulk settlement practice, knew about the income being generated, and knew that investors cared

about this issue but did not know about the practice.  Failing to disclose the practice to investors,

in light of other statements they made and their disclosure obligations, was unreasonable.  As a

result, the Bear entities' conduct was negligent.

**The WMC4 Transaction**

61.     The WMC4 transaction began with an agreement in or about July 2006 by J.P.

Morgan Mortgage Acquisition Corporation ("J.P. Morgan Acquisition"), a direct, wholly owned

subsidiary of JPM Chase, to purchase more than 9,000 sub-prime mortgage loans from WMC.

The offering closed in December 2006.

**Background Related to Delinquency Disclosures**

62.     At all times relevant to the WMC4 transaction, regulation AB required disclosure

of delinquency information related to assets that provided collateral for an asset-backed

securities offering.  The required disclosures included disclosure of the method of determining

delinquencies, the total amount of delinquent assets as a percentage of the aggregate asset pool,

and other material information concerning delinquent assets and were specified in, among other

provisions, items 1100(b), 1105(a), 1111(c) of regulation AB [17 C.F.R. §§ 229.1100(b)

.1105(a)(c), .1111(c)].

63.     Information about the delinquency status of mortgage loans that provide collateral

for an RMBS offering was important to investors.  The mortgage loans that provide the collateral

in an RMBS transaction are the primary source of funds by which investors potentially can

recover and profit from their investments.  The presence and extent of  current and historical

delinquencies is important information to investors because it helps enable them to assess the

likelihood that borrowers will be able to repay their mortgage loans and, as a result, whether

investors will suffer losses on, or will recover and profit from, their investments.

64.     At the time of the WMC4 transaction, there were two primary methods for

determining delinquency status of a mortgage loan.  One method was known as the Office of

Thrift Supervision ("OTS") method, and the other was known as the Mortgage Bankers

Association ("MBA") method.  The OTS method primarily was used for determining the

delinquency status of sub-prime loans, and the MBA method primarily was used to determine the

delinquency status of prime and certain other types of loans.  Under the OTS method, a mortgage

loan was thirty days delinquent if payment due on a due date in one month was not received by

the close of business on the loan's due date in the following month.  Under the MBA method,

that mortgage loan was thirty days delinquent if payment was not received by the close of

business on the immediately preceding day.  As an example, if a loan had a payment due date of

November 1, that loan would be thirty days delinquent under the OTS method if the payment

was not received by the close of business on December 1.  Under the MBA method, however,

that loan would be thirty days delinquent if payment was not received by the close of business on

November 30.

65.     As set forth in greater detail _infra_ in this Complaint, JP Morgan and JPMAC disclosed that they used the OTS method for determining the delinquency status of the sub-prime mortgage loans that provided the collateral for the WMC4 transaction.  They further represented that they were disclosing the delinquency status of the mortgage loans as of the close of business on December 1, 2006, the cut-off date for the transaction.  Payments on all or virtually all of the loans included as collateral for the WMC4 transaction were due on the first day of each month. As a result, under the OTS method, as described _supra_ in paragraph 64 of this Complaint, if a payment due on the first day of a month was not made by the close of business on the first day of the following month, that loan then would be thirty days delinquent.  The cut-off date for the WMC4 transaction thus corresponded with the date when loans with a November 1, 2006, or an October 1, 2006, next payment due date became thirty or sixty days delinquent.

### JP Morgan Acquisition Purchases the Loans from WMC, and JP Morgan and JPMAC Gather and Review Loan Information for Disclosure in the Offering Documents

66.     On or about July 20, 2006, J.P. Morgan Acquisition entered into a negotiated trade with WMC for the purchase of a $1 billion pool of sub-prime mortgage loans from WMC. Several days later, the parties agreed to increase the size of the trade to the purchase of $2 billion of sub-prime mortgage loans.  The purchase was to close on October 30, 2006.

67.     On or about October 30, 2006, J.P. Morgan Acquisition closed on the purchase of approximately 9,832 sub-prime mortgage loans from WMC for approximately $2 billion.  J.P. Morgan Acquisition subsequently sold at least 9,637 mortgage loans to JPMAC.  JPMAC, in turn, sold 9,637 loans to the trust known as J.P. Morgan Mortgage Acquisition Trust 2006-WMC4 that was established for the WMC4 transaction.  WMC and JP Morgan agreed on a December 1, 2006, effective date for the transfer of servicing from the companies servicing the

loans for WMC to the companies servicing the loans for the trust, JP Morgan Chase Bank, N.A. and Chase Home Finance LLC (the "Chase servicers").

68.     Also following the purchase of the mortgage loans from WMC, JP Morgan and JPMAC personnel began work on the offering that came to be known as the WMC4 transaction. As part of that work, JP Morgan and JPMAC personnel gathered some information on the payment status of loans to be included as collateral for the WMC4 transaction.  They gathered this information, at least in part, in connection with required disclosures about whether the mortgage loans were or had been delinquent.  Those disclosures included representations about both current and historical delinquencies.

69.     While JP Morgan and JPMAC personnel gathered information on the payment status of loans that were to provide collateral for the WMC4 transaction, JP Morgan and JPMAC personnel also worked on preparation of a number of documents used to complete the transaction.  These documents included a preliminary prospectus supplement and the final prospectus supplement.  Both of these documents were filed with the Commission.  The prospectus supplement was filed pursuant to a registration statement for RMBS offerings that JPMAC previously had filed and, once filed, became part of that registration statement.  The drafting of the preliminary prospectus supplement and the prospectus supplement took place primarily during the period from early December 2006 through December 20, 2006, the date when the prospectus supplement was filed with the Commission.

**JP Morgan and JPMAC Ostensibly Use the OTS Method of Determining the Delinquency Status of the Mortgage Loans Included in the WMC4 Transaction**

70.     The initial draft of the preliminary prospectus supplement for the WMC4 transaction included the following description of the method that JP Morgan and JPMAC used for determining whether a loan was delinquent:

Mortgage loans are recognized for delinquency and default pursuant to the Office of Thrift Supervision ("OTS") methodology.  Under the OTS methodology, a mortgage loan is considered delinquent if any payment due thereon is not made pursuant to the terms of such mortgage loan by the close of business on the day such payment is scheduled to be due.  A mortgage loan is "30 days delinquent" if such payment has not been received by the close of business on the corresponding day of the month immediately succeeding the month in which such payment was due, or, if there is no such corresponding day (e.g., as when a 30-day month follows a 31-day month in which a payment was due on the 31st day of such month), then on the last day of such immediately succeeding month.  Similarly for "60 days delinquent," "90 days delinquent" and so on.

This description was included in the final versions of the preliminary prospectus supplement and prospectus supplement that were filed with the Commission.

### JP Morgan and JPMAC Receive Information that Loans to Be Included in the WMC4 Transaction Were Thirty or More Days Delinquent

71.     On or about December 13, 2006, JP Morgan personnel working on the WMC4 transaction circulated information showing that, as of December 11, 2006, payments due on November 1, 2006, for approximately 777 of the mortgage loans purchased from WMC, with a principal balance of approximately $175,814,675, had not been made and that payments due on October 1, 2006, for approximately 4 loans, with a principal balance of approximately $703,660, also had not been made.

72.     Also on or about December 13, 2006, a JP Morgan investment banker working on the WMC4 transaction raised a question about whether loans purchased from WMC as to which payment was due on November 1, 2006, but was not received by December 1, 2006, were thirty days delinquent under the OTS method of determining delinquencies.  The OTS method of determining the delinquency status of a mortgage loan is described supra in paragraphs 64 and 65 of this Complaint, and JP Morgan and JPMAC used the close of business on December 1, 2006, as the "cut-off date" for information to be included in the prospectus supplement for the WMC4 transaction.

25

73.     As a result of the question about delinquent mortgage loans that the JP Morgan investment banker referenced <u>supra</u> in paragraph 72 of this Complaint had raised, on or about December 13, 2006, JP Morgan and JPMAC personnel responsible for completing the WMC4 transaction contacted counsel for JP Morgan and JPMAC to discuss the issue.  At the time of that communication, JP Morgan and JPMAC had been planning to "print" the preliminary prospectus supplement on December 13, 2006, and then to file it with the Commission.  As a result of the delinquency issue, however, participants in the communication with counsel for JP Morgan and JPMAC decided to delay the printing of the preliminary prospectus supplement.  In an e-mail to a JP Morgan trader, the individual who had raised the issue, wrote that

> [w]e decided not to print tonight . . . because we weren't able to come to a consensus with the lawyers on the delinquency and the definition of 'Cut-off Date' [sic]  We will continue to work with . . . [a law firm] to come up with an acceptable Cut-off/delinquency definition in the morning.  At the end of the day, everything might stay the way it is now.  We will call you in the morning to discuss.

Counsel for JP Morgan and JPMAC thereafter discussed the OTS method of determining the delinquency status of a mortgage loan with personnel from JP Morgan, JPMAC, and the Chase servicers.

74.     In or about the morning of December 14, 2006, the JP Morgan investment banker referenced <u>supra</u> in paragraph 72 of this Complaint discussed the OTS method of determining the delinquency status of a mortgage loan with counsel for JP Morgan and JPMAC.  Following that conversation, that JP Morgan investment banker sent an e-mail both to JP Morgan traders and to a more senior JP Morgan investment banker working on the WMC4 transaction in which he stated that "FYI attached is a delinquency breakdown.  Assuming everything is correct, roughly 8.8% ($169 mm) of the pool looks to be delinquent as of last night."  The investment banker who

sent the e-mail attached a one-page document that showed the number and current balances of mortgage loans with next payment due dates of October 1, 2006, and November 1, 2006.

75.     In or about the afternoon of December 14, 2006, the investment banker referenced supra in paragraph 72 of this Complaint, sent an e-mail to counsel for JP Morgan and JPMAC. The investment banker wrote, "Delinquency as discussed" and attached the one-page document with the information about the mortgage loans with the October 1, 2006 and November 1, 2006, next payment due dates described supra in paragraph 74 of this Complaint.

### The Planned Delinquency Disclosures Exclude
### Loans with a November 1, 2006, Next Payment Due Date

76.     Also in or about the afternoon of December 14, 2006, after receiving the e-mail described supra in paragraph 75 of this Complaint, counsel for JP Morgan and JPMAC proposed changes to a planned section of the preliminary prospectus supplement, and the prospectus supplement, for the WMC4 transaction related to WMC's obligations to repurchase mortgage loans.  Among other things, counsel proposed the addition of the following language:  "The due date for the first monthly payment following the initial sale of the mortgage loans to the seller has occurred and a significant percentage (based on aggregate principal balance) of borrowers have failed to make such payment."  WMC objected to other portions of the repurchase obligation section because the company did not believe that the section accurately described WMC's repurchase obligations.  As a result of that objection, and after communications about the proposed disclosure with JP Morgan and JPMAC, and their counsel, the entire section was excluded from the preliminary prospectus supplement and the prospectus supplement.  The proposed disclosure that a significant percentage of borrowers had failed to make their first payment following the sale of the loans thereafter was not included anywhere in either the preliminary prospectus supplement or the prospectus supplement.

27

77.     JP Morgan and JPMAC, through their personnel, also decided to exclude mortgage loans with a November 1, 2006, next payment due date from the disclosures of loans that were or had been thirty or more days delinquent that would be included in the preliminary prospectus supplement and the prospectus supplement.

78.     In or about the evening of December 14, 2006, counsel for JP Morgan and JPMAC circulated a draft of the preliminary prospectus for the WMC4 transaction to JP Morgan and JPMAC personnel and others who were working on the transaction.  That draft included the addition of language on delinquent loans to sections of the preliminary prospectus supplement entitled "Risk Factors," "Description of the Mortgage Pool," and "Delinquency and Foreclosure Information for the Mortgage Loans":

a.      the Risk Factors language, in relevant part, provided that "[a]pproximately 0.01%, 0.05% and 0.04% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively (in each case, by aggregate principal balance of the related group or aggregate pool, as applicable), as of the cut-off date, were 30 to 59 days delinquent";

b.      the Description of the Mortgage Pool language, in relevant part, provided that

[a]s of the Cut-off Date, 0.01%, 0.05% and 0.04% of the Mortgage Loans in Group 1, Group 2 and the Aggregate Pool were considered 30-59 days delinquent. As of the Cut-off Date, no Mortgage Loan was 60 or more days delinquent.  The delinquency status of a mortgage loan is determined as of the due date in the following month in accordance with the OTS method, so that, for example, if a borrower failed to make a monthly payment due on November 1 by November 30, that mortgage loan would be considered less than 30 days delinquent in payment.  If a borrower failed to make a monthly payment due on October 1 by November 30, that mortgage loan would then be considered to be at least 30 but less than 60 days delinquent in payment; and

c.      The Delinquency and Foreclosure Information for the Mortgage Loans section was changed from a representation that, as of the cut-off date, no loan had been

28

thirty or more days delinquent during the preceding twelve months to the inclusion of  (i)

a chart showing that, as of the cut-off date, 4 loans with a principal balance of

$703,255.94, and representing .04% of the loan pool, had been 30 – 59 delinquent in the

preceding 12 months, and no loan had been 60 or more days delinquent and (ii) a

representation that, as of the cut-off date, no loan had had more than one instance of

delinquency.

79.     The proposed delinquency disclosures for the preliminary prospectus supplement

for the WMC4 transaction, described <u>supra</u> in paragraph 78 of this Complaint, ostensibly related

to the number and percentage of mortgage loans that were thirty or more days delinquent as of

the cut-off date for the transaction, the close of business on December 1, 2006.  The description

of whether a loan would be delinquent under the OTS method added to the draft preliminary

prospectus supplement described <u>supra</u> in paragraph 78.b. of this Complaint, however, related

only to the delinquency status of a loan on November 30.  That description had not been used in

offering documents for prior RMBS transactions.  It was created and added to offering

documents for the WMC4 transaction after the investment banker referenced <u>supra</u> in paragraph

72 of this Complaint raised the delinquency issue.

80.     At or about 10:06 p.m. on December 14, 2006, a little more than an hour and a

half after counsel for JP Morgan and JPMAC circulated the draft preliminary prospectus

supplement for the WMC4 transaction described <u>supra</u> in paragraph 78 of this Complaint,

counsel circulated another draft to JP Morgan and JPMAC personnel and others who were

working on the transaction.  In this draft, the November 30 date that had been used in the

description of whether a mortgage loan would be delinquent under the OTS method set forth

supra in paragraphs 78.b and 79 of this Complaint was changed to December 1.  The draft, in

relevant part, then provided as follows:

> The delinquency status of a mortgage loan is determined as of the due date in the
> following month in accordance with the OTS method, so that, for example, if a borrower
> failed to make a monthly payment due on November 1 by ~~November 30,~~ December 1,
> that mortgage loan would be considered less than 30 days delinquent in payment.  If a
> borrower failed to make a monthly payment due on October 1 by ~~November 30,~~
> December 1, that mortgage loan would then be considered to be at least 30 but less than
> 60 days delinquent in payment.

Consistent with the description of the OTS method set forth supra in paragraph 70 of this

Complaint, and included in the final versions of the preliminary prospectus supplement and the

prospectus supplement for the WMC4 transaction, a mortgage loan with a payment due on

November 1 would be thirty days delinquent if that payment was not received by the close of

business on December 1.

81.     At or about 11:39 p.m. on December 14, 2006, a little more than an hour and a

half after counsel for JP Morgan and JPMAC circulated the draft preliminary prospectus

supplement for the WMC4 transaction described supra in paragraph 80 of this Complaint,

counsel circulated another draft to JP Morgan and JPMAC personnel and others working on the

transaction.  In this draft, the December 1 date that had been used in the description of whether a

mortgage loan would be delinquent under the OTS method set forth supra in paragraph 80 of this

Complaint was changed back to November 30.  The draft, in relevant part, then provided as

follows:

> The delinquency status of a mortgage loan is determined as of the due date in the
> following month in accordance with the OTS method, so that, for example, if a borrower
> failed to make a monthly payment due on November 1 by ~~December 1,~~ November 30,
> that mortgage loan would be considered less than 30 days delinquent in payment.  If a
> borrower failed to make a monthly payment due on October 1 by ~~December 1,~~ November
> 30, that mortgage loan would then be considered to be at least 30 but less than 60 days
> delinquent in payment.

30

**The Offering for the WMC4 Transaction and the Delinquency Disclosures that JP Morgan
and JPMAC Made in the Prospectus Supplement and Preliminary Prospectus Supplement**

82.      After the change to the delinquency disclosure described supra in paragraph 81 of

this Complaint was made, JP Morgan and JPMAC finalized the preliminary prospectus

supplement for the WMC4 transaction and, on December 15, 2006, delivered it to the

Commission for filing.  The preliminary prospectus supplement was deemed filed with the

Commission on December 18, 2006.

83.      After filing the preliminary prospectus supplement for the WMC4 transaction

with the Commission, JP Morgan and JPMAC personnel, as well as their counsel, worked to

complete the prospectus supplement for the transaction.  During the time when they were

completing the prospectus supplement, JP Morgan personnel prepared, and sent to other JP

Morgan personnel working on the transaction, a document known as a "final issuance tape."  The

final issuance tape included a list of each sub-prime mortgage loan that was providing collateral

for the transaction and columns of information on each loan.  Among the information included in

the final issuance tape was the next payment due date for each loan.  As set forth in the final

issuance tape, approximately 717 loans, with a principal balance of approximately $159.6

million had a next payment due date of November 1, 2006.

84.      In the prospectus supplement, and the preliminary prospectus supplement, for the

WMC4 transaction, JP Morgan and JPMAC made representations with respect to loans that were

delinquent as of the cut-off date for the transaction, the close of business on December 1, 2006,

as well as loans that had been delinquent during the twelve months ended as of the cut-off date.

JP Morgan and JPMAC represented that, as of the cut-off date, (a) based on the aggregate

principal balance, .04% of the mortgage loans in the loan pool that provided the collateral for the

transaction were 30 – 59 days delinquent; (b) no loan was 60 or more days delinquent; (c) 4

31

loans, representing .04% of the loans based on the aggregate principal balance, had been 30 – 59

days delinquent in the preceding twelve months; and (d) no loan had had more than one instance

of delinquency in that twelve month period.   JP Morgan and JPMAC also made the following

representation with respect to the statistical information included in the prospectus supplement

and the preliminary prospectus supplement:

> The statistical information on the mortgage loans presented herein is based on the
> principal balance of such mortgage loans as of the close of business on December 1, 2006
> (referred to herein as the "cut-off date").  Such information does not take into account
> defaults, delinquencies and prepayments that may have occurred with respect to the
> mortgage loans since such date.  As a result, the statistical distribution of the
> characteristics in the final mortgage groups as of the closing date will vary from the
> statistical distribution of such characteristics as presented in this prospectus supplement,
> although such variance will not be material.

85.     In making the delinquency disclosures described supra in paragraph 84 of this

Complaint, JP Morgan and JPMAC did not include any of the loans that had a November 1,

2006, next payment due date.

86.     On December 20, 2006, JP Morgan and JPMAC filed the prospectus supplement

for the WMC4 transaction with the Commission.  In connection with the finalization of the

prospectus supplement for the transaction, counsel for JP Morgan and JPMAC issued what was

known as a "negative assurance" letter to JP Morgan and JPMAC.  In that letter, counsel stated

that, "on the basis of the information gained in the course of performing the services" described

in the letter, "nothing came to our attention that caused us to believe" that the prospectus

supplement or the preliminary prospectus supplement "contained an untrue statement of a

material fact or omitted to state a material fact necessary in order to make the statements therein,

in light of the circumstances under which they were made, not misleading."  At the same time,

however, counsel expressly disclaimed responsibility for, among other things, statistical or

32

numerical information included in the prospectus supplement or the preliminary prospectus supplement.

87.     The prospectus supplement that JP Morgan and JPMAC filed on December 20, 2006, was for the offer of approximately $1,834,557,000 of securities collateralized by 9,637 sub-prime mortgage loans with a total principal balance of approximately $1,911,922,433.  In addition to being filed with the Commission, the prospectus supplement was attached to a private placement memorandum used to sell one tranche of $19,120,000 of securities.

88.     In connection with the WMC4 transaction, JP Morgan sold most of the tranches of securities to investors and received approximately $1.8 billion from those sales.  JP Morgan, in turn, paid JPMAC, and JPMAC received, slightly less than the amount that JP Morgan had received from the sales to investors.  From the proceeds that it received, JP Morgan allocated itself an underwriting fee of approximately $2,780,516.

**After the Prospectus Supplement Was Filed,
JP Morgan and JPMAC Receive Additional Delinquency Information**

89.     By the time when the WMC4 transaction was completed, subsidiaries of JPM Chase, and the Chase servicers, were acting as servicer and sub-servicer of the mortgage loans included as collateral for the transaction.  Shortly after completion of the transaction, it was determined that the company that had been servicing the loans purchased from WMC before the Chase servicers had made an error related to the entry and recording of the next payment due dates for certain of the loans.  The Chase servicers sought to have the error corrected, and the prior servicer made changes to the next payment due dates.  After these changes were made, JP Morgan and JPMAC received information showing that, as of the cut-off date for the transaction, approximately 632 loans had a next payment due date of November 1, 2006.

90.     Following the changes to the next payment due dates described <u>supra</u> in paragraph 89 of this Complaint, JP Morgan and JPMAC determined that payments due on November 1, 2006, for nine of the loans, with a principal balance of approximately $1.5 million, included as collateral for the WMC4 transaction had been made by the cut-off date for the transaction. Those loans, therefore, would not have needed to have been included in the calculation determination of loans that, as of the cut-off date, were thirty or more days delinquent.

**The Delinquency Disclosures that JP Morgan and JPMAC Made
in the Prospectus Supplement and Preliminary Prospectus Supplement
<u>Were Materially False and Misleading</u>**

91.     Under the OTS method of determining the delinquency status of a mortgage loan, as described <u>supra</u> in paragraphs 64 and 65 of this Complaint, the loans included as collateral for the WMC4 transaction as to which payments due on November 1, 2006, had not been made by the cut-off date for the transaction should have been treated and disclosed as loans that were 30-59 days delinquent.  Rather than the .04% of loans in the aggregate loan pool, representing 4 loans, that JP Morgan and JPMAC disclosed, there were approximately 623 loans that, as of the cut-off date, were 30 – 59 days delinquent.   Based on their principal balance, those 623 loans represented approximately 7.1% or $135.4 million of the loans included as collateral for the WMC4 transaction.  The loans representing the .04% that were disclosed as being 30 – 59 days delinquent had an October 1, 2006, next payment due date and, therefore, should have been treated, and disclosed, as 60 – 89 days delinquent as of the cut-off date.

92.     The disclosure concerning historical delinquencies described <u>supra</u> in paragraph 84 of this Complaint was materially inaccurate because more than 620 loans had experienced instances of delinquency of 30 or more days in the twelve months ended as of the cut-off date.

93.     Information about the extent to which the sub-prime mortgage loans that provided collateral for the WMC4 transaction included loans that were or had been delinquent was important to potential investors.

## Losses on the WMC4 Transaction

94.     Investors in the WMC4 transaction have suffered significant losses.  With respect to the more than 620 loans that had instances of delinquency of thirty or more days, described supra, in paragraphs 91 and 92 of this Complaint, certain of the loans were repurchased from J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, the trust established in connection with the WMC4 transaction.  Loans that were not repurchased have actual and projected losses, based on bankruptcies and foreclosures, totaling at least $37 million.  As a result of the sale of delinquent loans to J.P. Morgan Mortgage Acquisition Trust 2006-WMC4, investors have suffered those losses.

## CLAIM FOR RELIEF

### Violations of Section 17(a)(2) and (3) of the  Securities Act
[15 U.S.C. §77q(a)(2), (3)]

95.     Paragraphs 1 through 94 of this Complaint are hereby restated and incorporated herein by reference.

96.     Defendants JP Morgan, EMC, BSABS, SAMI, SACO, and JPMAC, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, in the offer or sale of securities, obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading and engaged in a transaction, practice, or course of business which

operated or would operate as a fraud or deceit upon purchasers.  A violation of sections 17(a)(2) or (3) of the Securities Act may be established by a showing of negligence.

97.    By reasons of the foregoing, Defendants JP Morgan, EMC, BSABS, SAMI, SACO, and JPMAC each violated section 17(a)(2), (3) of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment

A.    permanently enjoining each of Defendants JP Morgan, EMC, BSABS, SAMI, SACO, and JPMAC from violating section 17(a)(2), (3) of the Securities Act [15 U.S.C. §77q(a)(2), (3)];

B.    ordering Defendants JP Morgan, EMC, BSABS, SAMI, and SACO, jointly and severally, to pay disgorgement of ill-gotten gains from the bulk settlement practices, plus pre-judgment interest;

C.    ordering Defendants JP Morgan and JPMAC jointly and severally to pay disgorgement of the amount of underwriting fees allocated in connection with the WMC4 transaction as well as losses avoided on the mortgage loans included as collateral for the WMC4 transaction that, as of the cut-off date for the transaction, were or had been delinquent by thirty or more days but that were not disclosed as delinquent, plus pre-judgment interest;

D.    ordering each of Defendants JP Morgan, EMC, BSABS, SAMI, SACO, and JPMAC to pay a civil penalty pursuant to section 20(d) of the Securities Act [15 U.S.C. §77t(d); and

E.      granting such other relief as the Court deems just and appropriate.


Dated:  November 16, 2012                  Respectfully submitted,

                                              /s/ Kyle M. DeYoung
                                            Kyle M. DeYoung (472613)
                                            Christian D. H. Schultz (485557)
                                            Kenneth R. Lench (424878)
                                            Andrew B. Sporkin (419851)
                                            Thomas D. Silverstein (256362)
                                            Sarra Cho (484747)
                                            Securities and Exchange Commission
                                            100 F Street, N.E.
                                            Washington, D.C. 20549
                                            Telephone (202) 551-4466
                                            Fax (202) 772-9292
                                            DeYoungK@sec.gov

Of Counsel:

Laura M. Metcalfe
Allison Herren Lee
Amy A. Sumner
Dugan Bliss
Securities and Exchange Commission
1801 California Street
Suite 1500
Denver, CO 80202-2656