## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 12-1862 (JEB)** |
| **J.P. MORGAN SECURITIES LLC,** *et al.*, | |
| **Defendants.** | |

### MEMORANDUM OPINION

The Securities and Exchange Commission has, to its detriment in this case, taken too literally the immortal admonition of the famed 1990s pop-music trio TLC: "Don't go chasing waterfalls." The fountainhead of the current dispute is located in a settlement between Plaintiff SEC and Defendants J.P. Morgan Securities LLC and various related entities. The Commission thereby obtained nearly $75 million in disgorgement, prejudgment interest, and civil penalties for that company's misrepresentations in its offerings of residential mortgage-backed securities.

Two Investors, EP Structured Credit Strategies Fund, Ltd. and CXA-13 Corporation, now object to the SEC's proposed *pro rata* distribution plan of those sums. They contend that higher-priority investors should instead be paid out first — in a so-called "waterfall" payment structure — and that the Commission failed to ask the Internal Revenue Service whether such a scheme would be feasible under the tax code. Because the Court concludes that the SEC should have chased down this waterfall and assessed its viability, as required by the settlement agreement, it will direct the Commission to do so and then submit a new distribution plan.

I.      **Background**

This lawsuit is best characterized as a vehicle to distribute settlement proceeds obtained by the SEC.  Although the case originated with a Complaint, as most do, Defendants simultaneously consented to the Court's entry of judgment.  See ECF Nos. 1 (Complaint), 1-2 (Consent), 1-3 (Proposed Judgment).  J.P. Morgan did so "[w]ithout admitting or denying the allegations of the complaint."  Consent, ¶ 2; see generally SEC v. Vitesse Semiconductor Corp., 771 F. Supp. 2d 304, 308-10 (S.D.N.Y. 2011) (retracing history of "neither admit nor deny practice" in SEC enforcement actions).

This Opinion must nevertheless provide some background.  In doing so, the Court primarily relies on the Complaint's telling of the relevant facts (while drawing from the parties' submissions as necessary), realizing that J.P. Morgan has not conceded that any of the below events actually happened.

A.  Structure of RMBS Trusts

As with many residential-mortgage-backed-securities (RMBS) disputes, this one began before the financial crisis.  Around October 2006, J.P. Morgan purchased nearly 10,000 subprime mortgage loans from WMC Mortgage Corporation, a loan originator, in a deal worth roughly $2 billion.  See Compl., ¶¶ 19, 61, 66.  Following several transactions within the J.P. Morgan family of companies, Defendant directed that 9,637 loans would be held by J.P. Morgan Mortgage Acquisition Trust 2006-WMC4.  Id., ¶ 67.  The Trust, in turn, sought to attract investors.

Much has been said about how financial firms mold loans into investments.  In describing the process, perhaps movies such as *Inside Job*, *Too Big to Fail*, or *The Big Short* are of greater use than the Complaint, which assumes some fluency in Wall Street-ese.  Here is the basic vocabulary.  Residential mortgages require monthly payments from homeowners.  Gather

enough of these mortgages together, and the owner of the loans can reap an ample monthly cash flow.  <u>Id.</u>, ¶¶ 22-25.  For investors looking for long-term revenue, a collection of mortgages may fit the bill.  In this case, the WMC4 Trust held one such pool.  <u>Id.</u>, ¶ 67.  That Trust remains active today.

Pooling mortgages may also offer benefits for smaller investors.  For an individual seeking a steady income stream, a percentage share of a bundle of mortgages may be more attractive than owning a single mortgage worth that same value.  Where a single homeowner may default, it is less likely — though still possible, as the financial crisis made clear — that many in a pool will simultaneously do so.  The next step is thus to structure the mortgage-ownership opportunity so that many different types of investors can buy in.

To attract all the partygoers to the fete, a company (like J.P. Morgan) thus divvies up the ownership interests of a single mortgage bundle.  In this case, the WMC4 Trust would sell to investors securities (<u>i.e.</u>, certificates representing discrete ownership interests) backed by the group of residential mortgages (hence, RMBS).  <u>Id.</u>, ¶ 28.  As discussed, the securities would then entitle those investors to a long-term share of the Trust's monthly cash flow.  <u>Id.</u>  Because the WMC4 Trust, in effect, only passed through homeowners' mortgage payments to investors, it had the added benefit of qualifying as a Real Estate Mortgage Investment Conduit (REMIC) under tax law and was thereby exempt from taxation.  <u>Id.</u>, ¶ 27.

One further wrinkle is relevant here.  Because investors typically have different risk tolerances based on their financial strategies, RMBS trusts can vary the risk profiles of their securities offerings.  In this case, that was done by allowing investors to purchase securities in different-level tranches of the pool.  <u>Id.</u>, ¶¶ 28, 87-88.  Broadly speaking, each month, investors in higher (or senior) tranches would be paid before those in lower (or junior) tranches.  <u>Id.</u>

Because junior investors might receive less or nothing at all, their securities were riskier and thus entitled them to a higher rate of return.  Id.

This tiered-tranche setup is known as a "waterfall" structure.  For a casual reader, this metaphor may seem confusing at first because, as seen below, all water that enters a waterfall inevitably ends up in a pond at the bottom:



The proper metaphor would instead be a champagne tower, where the bottom investors are left thirsty until those above are filled with bubbly:



Aquatic metaphors aside, all that is necessary to understand about the payment-priority structure of the WMC4 Trust is that investors in junior tranches would be paid after those holding senior-tranche securities, assuming any money was left over at all.

B.  J.P. Morgan's Actions

Securities — including those in the WMC4 Trust — do not sell themselves.  To inform relevant parties about the Trust and assist them in gauging its quality, J.P. Morgan prepared for the SEC and potential investors a so-called prospectus supplement that disclosed the number of delinquent loans.  Id., ¶¶ 82-86.

In that supplement, the company stated that no loan was 60 or more days delinquent and that only 4 loans (.04% of the pool) were 30 or more days delinquent.  Id., ¶ 84, 91.  As it turned out, those 4 loans were 60 days delinquent, and 623 loans were 30 days delinquent.  Id., ¶¶ 89-91.  J.P. Morgan, moreover, knew of these facts and internally discussed information indicating that roughly 700 loans were 30 or more days delinquent.  Id., ¶¶ 71, 74, 83.  Without disclosing these revelations, in December 2006, J.P. Morgan sold most tranches of WMC4 Trust securities to investors and grossed approximately $1.8 billion.  Id., ¶¶ 84-88.  For setting up the trust, it earned an underwriting fee of roughly $2.8 million.  Id., ¶ 88.

Although those non-disclosures are the relevant actions here, the Court notes for completeness that the Complaint alleges a second set of acts.  Entities affiliated with The Bear Stearns Companies, LLC — later merged with J.P. Morgan — also engaged in some malfeasance.  Id., ¶ 1.  Like J.P. Morgan, those companies packaged RMBS trusts.  After those trusts were set up and their securities sold, however, Bear Stearns would negotiate large-scale cash settlements with the loan originators on the basis that they had sold Bear Stearns defective loans.  Id., ¶¶ 33-37.  Instead of passing the proceeds of those bulk settlements on to investors —

who effectively owned the loans via their RMBS-trust securities — Bear Stearns kept the money for itself.  Id., ¶¶ 46-60.

C.  Distribution Plan

Targeting these two practices, the SEC brought this Securities Act lawsuit against various J.P. Morgan entities on November 16, 2012.  In the proposed judgment, the Commission stated that the company would pay $74.5 million in disgorgement, prejudgment interest, and civil penalties for its loan-delinquency non-disclosures.  See Proposed Judgment at 5.  (For the separate loan-settlement practices of Bear Stearns, J.P. Morgan would pay over $222 million.  Id. at 2.)  Judge Robert Wilkins, then assigned to the case, accordingly entered Judgment in January 2013.  See ECF No. 3.

Where would all that money go?  The Judgment introduced a blueprint for how the $74.5 million might be handled, which the Court repeats here in full:

> The Commission may propose a plan to distribute the Fund pursuant to the Fair Fund provisions of Section 308(a) of the Sarbanes–Oxley Act of 2002 subject to the Court's approval.  The Commission will use reasonable efforts to confirm with the Internal Revenue Service that the distribution of the Fund will be consistent with the continued treatment of the trust at issue as a qualifying real estate investment conduit under the United States Internal Revenue Code.  In the event such confirmation by the Internal Revenue Service is obtained, the Commission intends to propose to the Court a plan to distribute the Fund to the specific securitization trust affected by the delinquency disclosure conduct alleged by the Commission in the Complaint.  In the event such confirmation by the Internal Revenue Service is not obtained, the Commission intends to propose to the Court a plan to distribute the Fund to investors affected by the delinquency disclosure conduct alleged by the Commission in the Complaint, if the Commission deems such a plan to be feasible given the costs and burden involved in the distribution.

Id. at 6-7; accord id. at 4 (same for funds relating to settlement practices).  In simpler terms, the Judgment permits the SEC to distribute the settlement proceeds.  If it chose to do so, it could

introduce a plan and then confirm with the IRS the tax treatment of any distributions.  Depending

on the IRS's opinion, the SEC intended either to place the proceeds in the WMC4 Trust (to be

doled out to investors according to the Trust's distribution rules) or to propose an alternative

distribution plan to affected investors.

This process has been ongoing.  In March 2014, as Judge Wilkins had since been elevated

to the D.C. Circuit, Judge Ellen Huvelle granted the SEC's motion to establish two Fair Funds —

one holding delinquency-disclosure proceeds and another with settlement-practice proceeds.  See

ECF No. 11 (Fair Fund Order).  Two years later, in June 2016, the Commission submitted two

proposed plans of distribution and moved for their approval.  See ECF Nos. 12 (Motion to

Approve), 12-2 (Bulk-Settlement Distribution Plan), 12-3 (Delinquency-Disclosure Distribution

Plan); see also ECF No. 18 (Addenda to Distribution Plans).

Although no one objected to the Bulk-Settlement Distribution Plan, the same cannot be

said for the Delinquency-Disclosure Distribution Plan.  That latter Plan defines an "Eligible

Claimant" as a person who had purchased more than $250 in WMC4 Trust securities on or

before January 25, 2007 — i.e., the Trust's first month.  See Plan, ¶¶ 15, 17-18.  For those

claimants, the Plan spells out that the "Fair Fund shall be distributed on a *pro rata* basis."  Id.,

¶ 34.  That is, payments would be "determined by the Eligible Claimant's investment in the

WMC4 transaction divided by the sum of all Eligible Claimants' investments in the WMC4

transaction."  Id., ¶¶ 55-57.

Following motions by the WMC4 Trust's trustee and administrator and by the two above-

mentioned Investors (EP Fund and CXA-13) for time to look over or object to the Plan, the case

was transferred here, and this Court allowed for a review period.  See ECF Nos. 15, 19-20.  The

Court now addresses those Investors' objections and the SEC's responses.

II.    **Legal Standard**

In securities-law cases, the Sarbanes–Oxley Act of 2002, Pub. L. No. 107-204, "establishe[s] the ability of courts to create Fair Funds for monies from disgorgement and civil penalties[,] which are then to be distributed to investors." Cont'l Cas. Co. v. Duckson, 826 F. Supp. 2d 1086, 1097-98 (N.D. Ill. 2011); see 15 U.S.C. § 7246(a); see also Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81-82 (2d Cir. 2006) (Sotomayor, J.) (recounting legislative history regarding disgorgement and civil penalties). Combined, the twin remedies seek not "compensation of victims" but rather "'punishment of the individual violator and deterrence of future violations.'" WorldCom, 467 F.3d at 81 (quoting SEC v. Coates, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001)); see H.R. Rep. No. 101-616 (1990), as reprinted in 1990 U.S.C.C.A.N. 1379, 1384 ("[A]uthority to seek or impose substantial money penalties, in addition to the disgorgement of profits, is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator.").

A court examines a proposed distribution structure with this baseline understanding that investor compensation is only a "secondary goal." WorldCom, 467 F.3d at 81 (quoting SEC v. Fischbach Corp., 133 F.3d 170, 174 (2d Cir. 1997)). Courts may, within their discretion, thus approve a plan so long as it "proposes a fair and reasonable allocation of recovered funds to investors." SEC v. E-Smart Techs., Inc., 139 F. Supp. 3d 170, 193 (D.D.C. 2015); see WorldCom, 467 F.3d at 85 ("The district court was required only to determine that the SEC's distribution plan fairly and reasonably distributed the limited Fair Fund proceeds among the potential claimants."). Some investors will invariably be excluded. In crafting a plan, the SEC may "engage in the 'kind of line-drawing [that] inevitably leaves out some potential claimants.'" WorldCom, 467 F.3d at 83 (quoting SEC v. Wang, 944 F.2d 80, 88 (2d Cir. 1991)); see SEC v.

CR Intrinsic Investors, LLC, 164 F. Supp. 3d 433, 435 (S.D.N.Y. 2016) ("[N]early every plan to distribute funds obtained in an [SEC] enforcement action requires choices to be made regarding the allocation of funds between and among potential claimants within the parameters of the amounts recovered.") (quoting SEC brief with approval).

In short, "it remains within the court's discretion to determine how and to whom the money will be distributed." Fischbach, 133 F.3d at 175. "[U]nless the consent decree specifically provides otherwise[,] once the district court satisfies itself that the distribution of proceeds in a proposed SEC [distribution] plan is fair and reasonable, its review is at an end." Wang, 944 F.2d at 85 (emphasis added); see SEC v. Levine, 881 F.2d 1165, 1181 (2d Cir. 1989) ("Once the judgment consented to has been entered as the judgment of the court, the court is by and large required to honor the terms agreed to by the defendant."); cf. In re NFL Players Concussion Injury Litig., 821 F.3d 410, 447 (3d Cir. 2016) (cautioning, with settlements plans, not to "mak[e] the perfect the enemy of the good").

III.    **Analysis**

The central dispute here boils down to whether the money should be distributed through the WMC4 Trust's seniority system or outside its strictures. While the Commission proposes to distribute the Fair Fund *pro rata* directly to those who bought shares, the Investors voice two primary objections, one procedural and one substantive.

First, they contend that the proposal is not procedurally consistent with the Judgment, which contemplated that the SEC would consult with the IRS regarding the tax consequences of using the Trust's waterfall distribution and, if favorable, follow that route. See ECF No. 28 (Objection) at 8-10. Second, although the Commission responds that the Plan may nonetheless be approved without such consultation, the Investors raise a series of additional arguments to

show how it is not substantively fair and reasonable.  Id. at 10-12.  The Court addresses these

concerns separately.

     A.  Judgment

The Investors first insist that the Commission did not do what it must do under the

Judgment.  The Plan, they contend, is thus plainly invalid.

As a refresher, the consented-to Judgment states: "The Commission will use reasonable

efforts to confirm with the Internal Revenue Service that the distribution of the Fund will be

consistent with the continued treatment of the trust at issue as a qualifying real estate investment

conduit under the United States Internal Revenue Code."  Judgment at 7 (emphasis added).  The

SEC agreed to seek the IRS's say-so on the WMC4 Trust's tax-exempt REMIC status because it

"intend[ed] to propose to the Court a plan to distribute the Fund" through that Trust's waterfall

structure and did not wish to create tax-law snags.  Id.  Seizing on this language, the Investors

raise two related issues.

First, they contend that the SEC did not use reasonable efforts with the IRS regarding the

Trust's REMIC status.  See Obj. at 8-9.  In its Response, the Commission describes how it

"began making the required reasonable efforts to determine whether conducting the distribution

through the WMC4 Trust would jeopardize that Trust's REMIC status and thereby trigger tax

obligations."  ECF No. 33 (Response) at 8 (emphasis added).

Yet this explanation quickly founders.  The SEC never consulted the IRS about this

Trust's REMIC status.  Nor did the Commission ever seek an IRS opinion at all.  See, e.g., ECF

No. 28-6, Exh. E (IRS letter ruling in different case addressing that settlement's impact on

REMIC status).  Instead, the agency relays only that it "initiated or settled" a number of

unspecified "RMBS cases that it hoped would result in Fair Fund distributions to harmed

investors." Resp. at 8.  In 2013, the Commission and IRS then "discussed whether it would be possible to facilitate any Fair Fund distributions through the affected trusts in these cases through . . . a letter-ruling from the IRS." Id.  The SEC does not allege that it ever sought such a ruling however.

Rather, the Commission cut consultations short "[w]hile these discussions were ongoing." Id.  Notably, the termination of this inter-agency *tête-à-tête* was not the result of the IRS's shedding light on the WMC4 Trust's REMIC status.  The SEC instead ended the dialogue because a few of its attorneys "spoke with a representative for a <u>bank</u> acting as trustee in a <u>similar</u> RMBS case." Id. (emphases added).  That banker told those lawyers that RMBS trusts were not generally designed to distribute money judgments through their waterfall structures.  Id. at 8-9.

The ersatz tax opinion of a bank representative will not do.  As never asking the IRS for its opinion — through a letter ruling or otherwise — cannot be consistent with the Judgment's instruction to "use reasonable efforts to confirm" the WMC4 Trust's REMIC tax status with the Service, the Court agrees with the Investors' first contention that the present Plan cannot be approved.  See Judgment at 7.

The Investors are less successful on their related argument, which is that the Judgment's language also requires the SEC to employ the Trust's seniority structure if the IRS approves of it.  In other words, they contend that the "Judgment makes the IRS confirmation <u>the determining factor</u> of whether the Trust or a subset of investors receives the Fund" and gives the SEC no wiggle room to implement a *pro rata* distribution plan.  See Obj. at 9 (emphasis added).

The Investors have a point, albeit a much more limited one.  The Judgment, fairly read, does require the SEC to <u>consider</u> a waterfall distribution — indeed, the agency must consult the

IRS on that plan's viability.  Aside from that obligation, however, the decree merely lays out the Commission's plans as it saw the situation in 2012.  The Judgment states only that, if the IRS gave the green light, the SEC "<u>intends</u> to propose to the Court a plan to distribute the Fund" through the WMC4 Trust.  <u>See</u> Judgment at 7 (emphasis added).

Although the SEC may have so intended, nothing in the Judgment "specifically provides" that this is the route the agency <u>must</u> take.  <u>Wang</u>, 944 F.2d at 85.  All the Court can direct the SEC to do, for now, is to consider passing the Fair Fund through the WMC4 Trust by seeking the IRS's view on that distribution's tax implications.

B.  <u>Fair and Reasonable</u>

Normally, the Opinion would end here.  As the SEC has further homework to do, it might seem unnecessary for the Court to grade this first draft of the Plan.  Its fairness and reasonableness, however, is still relevant, as the Commission retorts that the Court should approve the Fair Fund distribution anyway.

In other words, the SEC asserts that <u>even if</u> it had sufficiently consulted with the IRS, it would still not choose to distribute funds through the WMC4 Trust's waterfall-priority structure. It would instead stick with its current *pro rata* scheme, as that option would be fairer and more reasonable.  In support, the SEC explains several downsides of the waterfall — namely, passing the Fair Fund through the WMC4 Trust may not reach the lower-tranche investors who were also deceived, might not be mechanically possible for the Trust, and would only benefit current investors and not past ones.  <u>See</u> Resp. at 9-10.  The agency, citing other administrative proceedings where the Commission has found a *pro rata* allocation to be fair and reasonable, thus seeks approval here and now.  <u>See</u> ECF Nos. 33-2, 33-3 (<u>Credit Suisse</u> Orders).

This, however, would require the Court to ignore the terms of the Judgment requiring IRS consultation first.  In this vein, the law indeed recognizes limited instances where a court may modify mandatory terms of an otherwise final judgment to avoid unjust outcomes.  A court may "revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong."  <u>Sys. Fed'n No. 91, Ry. Emp. Dep't v. Wright</u>, 364 U.S. 642, 651 (1961) (quoting <u>United States v. Swift & Co.</u>, 286 U.S. 106, 114 (1932)); <u>see</u> <u>Levine</u>, 881 F.2d at 1181 (commenting that "the court is <u>by and large</u> required to honor the terms agreed to by the defendant") (emphasis added).  The Commission thus believes that the Court should excuse it from the IRS-advice requirement because the Plan, as written, decidedly makes more sense than the alternative.

The Court cannot determine, however, that requiring the SEC to confer with the IRS would somehow work injustice such that the Commission should be excused from the settlement's terms.  Nor is the SEC's argument — that the *pro rata* Plan is unqualifiedly fairer and more reasonable than the Trust's waterfall-priority structure — altogether convincing.  Indeed, enough doubt clouds this particular Plan that abiding by the terms of the Judgment seems the most prudent way to accommodate the interests of the SEC, J.P. Morgan, and all WMC4 Trust certificate holders.

The Court highlights a few of the Investors' concerns to demonstrate why at least some uncertainty exists as to the relative merits of *pro rata* versus waterfall distribution.  First, the Investors believe that seniority-based payments better reflect the settled expectations of WMC4 Trust investors.  Because junior investors assumed a "higher risk of nonpayment," it would be unfair to pay them the same as their more senior fellows.  <u>See</u> Obj. at 10.  The Investors argue, in effect, that junior investors bought in at a price point reflecting the risk that delinquencies would

fall on their pocketbooks, and so they were (comparatively) harmed less by J.P. Morgan's delinquency non-disclosures.

Second, the Investors point out that the temporal limitation of Eligible Claimants is both too narrow and too broad.  It is too narrow because it excludes individuals who bought in <u>after</u> the first month; it is too broad because some first-month investors may have cashed out <u>before</u> public disclosures revealed the extent of J.P. Morgan's non-disclosures and brought the price of WMC4 Trust securities down.  <u>Id.</u> at 10-12.  The former concern is perhaps exaggerated, as investors knew after a month that the Trust held far more than the four advertised delinquent mortgages.  <u>See</u> ECF No. 28-2, Exh. A (January 25, 2007, Investor Report) at 8 (counting over 300 delinquencies).  But the overbreadth argument has some truth to it, as the Plan does not preclude those who sold their certificates before this disclosure from gaining a windfall.

Third, the Investors contend that the *pro rata* scheme disrupts the expectations of investors who purchased certificates <u>after</u> the Court entered Judgment.  <u>See</u> Obj. at 12.  Those individuals would have invested in reliance on the SEC's tentative proposal that it would seek to dole out funds through the WMC4 Trust's seniority structure.  The Investors thus claim that the SEC has not considered how post-Judgment purchasers may have valued securities based on the Commission's stated intentions to honor the waterfall scheme if possible.

The Court will not treat with these issues now, as it sets out the Investors' concerns merely to highlight that there is room for debate as to whether the Commission should prefer its current Plan or some seniority-based handouts.  Nor does the Court opine on whether any or all of these objections make the current Plan unfair or unreasonable.  It may, after all, be the case that the Investors' asserted inequities are simply the result of the prototypical "line-drawing" that occurs in Fair Fund distributions.  <u>WorldCom</u>, 467 F.3d at 83 (quoting <u>Wang</u>, 944 F.2d at 88).

For now, however, the Investors' complaints are reason enough for the Court not to peremptorily approve the present distribution structure in the face of a violation of the IRS-consultation requirement.  Perhaps discussions with the IRS will generate ideas to make the next iteration of the plan even better, and so the Court will instruct the SEC to engage in that dialogue.

* * *

Before the Court concludes, it notes one last matter.  As previously explained, the Bulk-Settlement Distribution Plan has not generated any opposition, although it is similar to the one at issue here.  Should the Commission seek the Court's separate approval of that Plan, it may renew its motion to approve as to that Plan at any time.

## IV.    Conclusion

For these reasons, the Court will accept the Investors' Objections and direct the SEC to confer with the IRS with regard to the tax viability of distributing the Fair Fund through the WMC4 Trust.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  January 4, 2017