UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**J.P. MORGAN SECURITIES LLC, EMC MORTGAGE, LLC, BEAR STEARNS ASSET BACKED SECURITIES I, LLC, STRUCTURED ASSET MORTGAGE INVESTMENTS II, INC., SACO I, INC., AND J.P. MORGAN ACCEPTANCE CORPORATION I,**<br><br>**Defendants.** | Civil Action No. 12-1862 (JEB ) |

## SECOND DECLARATION OF DR. EUGENE P. CANJELS

I, Eugene P. Canjels, Ph.D., pursuant to 28 U.S.C. § 1746, declare as follows:[1]

**I.   Scope of this Declaration**

1.   For the purposes of this declaration, I was asked by Commission staff to consider two issues related to the distribution of a Fair Fund established for the JPMAC 2006-WMC4 RMBS trust (the "WMC4 Trust" or "the Trust"). Specifically, staff asked me:

(i) to review the distribution plan proposed by the Objector in its filing of May 10, 2017, including the Objector's proposed methodology for calculating a "Recovery Cap," and to determine how the Objector's proposed distribution plan compares to the SEC's proposed Amended Distribution Plan; and

---

[1] My educational and professional experiences are described in my previous Declaration in this matter. Declaration of Dr. Eugene P. Canjels, ECF No. 45 ("Canjels 1st Decl."), ¶¶ 1, 2.

(ii) to evaluate certain arguments raised by the Objector in response to the Commission's proposed Amended Distribution Plan.[2]

## II. The Objector's Proposed Distribution Plan

2.  The Objector asks the Court to "order the Commission to distribute the Fair Fund to Certificateholders who held Certificates on November 16, 2012. The distribution should be made on a *pro rata* basis, first to the Senior Certificateholders up to each class of Senior Certificates' implied loss amount. If any funds remain after distributions to the Senior Certificates, the Commission should distribute the remaining funds to the Mezzanine Certificates."[3]

3.  The Objector defines "implied loss amount" as the unallocated loss amount on the underlying mortgage loans, that is, losses on the underlying mortgage loans that have been realized by the Trust but not yet allocated to the Senior Certificates.[4] The term "implied loss amount" may be confused with losses that can be inferred from market prices. To avoid such confusion, hereinafter, I will use the term "unallocated loss amount" instead of "implied loss amount."[5]

4.  At the outset, I note that the Objector's proposed Recovery Cap makes little sense. The Objector's Recovery Cap is based solely on realized but unallocated losses. It ignores the fact that, on any particular date, the Trust will contain loans in foreclosure or

---

[2] ECF No. 44-1.

[3] ECF No. 49 ("Obj."), at 22.

[4] Obj. 15: "[I]mplied losses on the Senior Certificates can be calculated using the difference between the aggregate of all Senior Class Principal Balances and the remaining collateral in the Trust as a proxy for the losses that the Senior Certificateholders will eventually have to realize." See also Declaration of Aleck Zhou, ECF No. 49-1 ("Zhou Decl."), ¶ 6.

[5] A loss amount derived from market prices would likely exceed the "unallocated loss amount," as it would incorporate expected future losses on mortgage loans that have not yet been liquidated. Such expected future losses are discussed further, below.

bankruptcy, which are virtually guaranteed to generate additional losses beyond the realized but unallocated losses. The Objector's methodology fails to take into account these virtually guaranteed loss amounts – which I refer to as "expected" or "unrealized" losses – in calculating the Recovery Cap. These losses, however, are incorporated in the transaction prices and the indicative prices provided by the various security pricing services.[6] For this reason, I included them in the unrealized loss calculation described in my original declaration.

    5.    The Objector's proposed plan is lacking in detail and ambiguous in several ways. I therefore make the following assumptions:

    a. First, I assume that, like the Commission's Amended Distribution Plan, the Objector uses the term "*pro rata* basis" to refer to *pro rata* shares of the Original Principal Amount, rather than the Principal Amount Outstanding at the time of the filing of the Complaint or at any other point.

    b. Second, because the unallocated loss amount is defined only for the entire Trust, I assume that these unallocated losses are attributed to the Senior Certificates in proportion to the Certificates' Principal Amount Outstanding at the time of the filing of the Complaint.

    c. Third, I assume that the Objector proposes to calculate the Recovery Cap based upon the unallocated loss amount derived from the Investor Report dated November 26, 2012.[7]

---

[6] Canjels 1st Decl. ¶¶ 28-29. The Objector claims that "[i]t is highly unlikely that an investor could buy or sell an RMBS at the indicative price, in no small part because indicative prices do not take into account all factors that could impact pricing." Obj. 9 n.7. While it is true that the RMBS market is illiquid, these prices are nonetheless widely used by the RMBS industry for purposes of valuation and price verification.

[7] The Objector states that the unallocated loss amount "at the time the Commission filed its Complaint" was approximately $131 million. Obj. 15 (citing Zhou Decl. ¶ 6). This

6. As of November 2012, approximately 38% of the original loan balance had been lost through liquidation.[8] An additional 30% had been paid off either through scheduled payments, unscheduled prepayments, or through recoveries on liquidations. Thus, the remaining pool balance was 32% of the original value of the loans.[9] Approximately 46% of the remaining outstanding balance was made up of loans that were one or more payments behind. Almost two thirds of those delinquent loans were being foreclosed, under bankruptcy, or already owned by the mortgage company.[10]

7. By November 2012, the entire principal balance of the Mezzanine Certificates (approximately $312 million) had been written off. The Senior Certificates had received principal payments of approximately 51% of their original investment. The outstanding principal amount on the Senior Certificates on November 26, 2012 was approximately $751 million. Realized but not yet allocated losses (or what I refer to as "unallocated loss amounts") on the underlying mortgages amounted to approximately $131 million or 17.4% of the outstanding Senior Certificate amount.[11]

---

calculation, however, appears to be based upon the monthly Investor Report dated November 26, 2012. Because the Complaint was filed on November 16, 2012, that Report had not yet been released. In the alternative, the unallocated loss amount could be based on the previous Investor Report dated October 25, 2012. However, since the Objector has relied upon the November 26, 2012 Investor Report, I will do the same. A copy of the November 26, 2012 Investor Report is attached as Exhibit C to the Declaration of Benjamin Levi as Exhibit C. See ECF No. 49-6 ("Nov. 2012 Report").

[8] Nov. 2012 Report, at 4.

[9] Id. at S1; Ex. B to Declaration of Benjamin Levi, ECF No. 49-5 ("Pros. Supp."), at 15/250.

[10] Nov. 2012 Report, at S12.

[11] Nov. 2012 Report, at 4. Notably, pricing data from IDC indicates that the Senior Certificates were expected to sustain much higher losses in the future. As of November 26, 2012, the indicative prices of the Senior Certificates ranged from 56 to 36 cents per dollar of outstanding principal for the A-1A, A-2, A-3, A-4, and A-5 Certificates, indicating unrealized loss amounts of 44% to 64%. The indicative price for the A-1B Certificate was only 9 cents per

8.  In **Exhibit 1** to this Declaration, I present the approximate distribution that would be generated by the Objector's proposed plan, augmented with the clarifying assumptions described above.[12] In **Exhibit 2**, I compare the results of distribution under the SEC's Amended Distribution Plan to a distribution under the Objector's proposed plan. The main effects of the Objector's proposed plan are as follows:

   a. Under the Commission's Plan, each tranche – except the A-2 tranche – would receive approximately 4.8% of their original investment back. The A-2 tranche would be subject to a 2.2% Recovery Cap, based upon the SEC's methodology for calculating the recovery cap, which would take into account both realized and unrealized (or expected) losses.[13] The Mezzanine tranches would receive approximately $15 million under the SEC's plan.

   b. Under the Objector's Plan, the Mezzanine tranches would receive nothing. The $15 million that they would receive under the SEC's plan would instead be shifted to and distributed among the Senior Certificates. The Senior Certificates – with the exception of the A-2 tranche – would receive distributions of approximately 7% of their original investment. The A-2 tranche would receive only 0.8% of their original investment, based upon the Objector's proposed methodology for calculating the Recovery Cap.

---

dollar of outstanding principal, the result of a trigger which made that Certificate junior to the A-1A Certificate, as I have previously described. See Canjels 1st Decl. ¶¶17, 19. Because the Objector relies upon the "unallocated loss amount" as of this date to set the Recovery Cap, the Recovery Cap for the A-2 tranche is much lower than if the Recovery Cap also took into account expected or unrealized losses.

[12] In Exhibit 1, I also assume that all investors in the Certificates submit valid claims.

[13] The Recovery Cap is estimated using the March 2017 Monthly Investor Report.

9.     The Objector's Plan would also likely reduce the amount that would be distributed to initial investors (*i.e.*, those investors who purchased their certificates before January 25, 2007) by (i) restricting distribution to initial investors who continued to hold their certificates on November 16, 2012, and (ii) permitting distribution to any other investor who purchased certificates at any point before November 16, 2012, and continued to hold those certificates as of November 16, 2012.

### III.   The Effect of the Complaint on Investors in November 2012

10.    The Objectors argue that the distribution plan should compensate only those investors that held certificates as of November 16, 2012, because "[i]t is the investors who held bonds at [the time of the Complaint] who are the true victims of JPM's fraud, as it was not until then that the bonds' value could have been adversely affected by the fraud."[14]

11.    Examination of the mortgages whose delinquencies went undisclosed in the prospectus supplement reveals the lack of logic in this argument.  The Complaint alleged that the WMC4 offering documents failed to disclose that 623 loans were 30-59 days delinquent as of the relevant cut-off date.  The Complaint estimated that the Trust would sustain at least $37 million in actual and projected losses on these 623 loans.[15]

12.    By November 2012, the Trust had realized losses of approximately $26 million (or approximately 70% of the expected $37 million) from loans within the group of 623 that had already been liquidated.  An additional $9.5 million in losses was expected from loans that were in bankruptcy, foreclosure, or REO.[16]

---

[14] Obj. 1.

[15] ECF No. 1 ¶¶ 65, 91, 94.

[16] These calculations are based on an analysis of loan-level data for the 623 loans.

6

13. In short, by November 2012, a significant majority of the 623 loans at issue had been liquidated. Once those loans were liquidated, they were no longer in the Trust's remaining pool of mortgages and would no longer have affected future cash flows into the Trust. In total, more than 93% of the losses projected to result from the 623 loans had been realized or would be realized shortly thereafter. These losses had already reduced the value of the outstanding Senior Certificates before the Complaint was filed (the Mezzanine Certificates had already been written off entirely). Practically speaking, the fact that delinquency information regarding those 623 loans had not been disclosed in the original offering documents would have been irrelevant to investors in November 2012.

## IV. The Limited Lifespan of Delinquency Information

14. The Objector argues that the misleading delinquency disclosures in the offering documents continued to matter as late as November 2012. The Objector's position is inconsistent with how participants in the RMBS industry use delinquency and other borrower payment information.

15. In a six-year period, many borrowers experience significant changes that affect their ability or willingness to pay their mortgages – a promotion, a new job, divorce, the market value of the home, etc. RMBS investors and market participants therefore evaluate *recent* payment performance in determining the likelihood that the borrower will pay in the future.

16. In August 2012, S&P published their ratings methodology for the RMBS product class into which the WMC4 Trust falls under the title "Methodology and Assumptions: U.S. RMBS Surveillance Credit and Cash Flow Analysis For Pre-2009 Originations," excerpts of which are attached hereto as **Exhibit 3**. According to S&P: "The analysis of a borrower's payment pattern over the last 24-months provides insight into the borrower's ability and

7

willingness to make the contractual payments due. The use of a 24-month history, in our view, is consistent with the associated degree of mortgage payment history that a lender would generally review when underwriting a loan to capture payment integrity."[17]

17.     The Underwriting Guidelines for the WMC4 Trust consider the borrower's mortgage payment history in assigning risk categories to the underlying mortgages. For each risk category, the payment history reflects payment activity only for the last 12 months. For instance, for a mortgage loan to be rated "A" the Underwriting Guidelines specify, "Not more than one 30-day delinquency during the preceding 12 months, and no 60-day delinquencies during the preceding 12 months."[18]

18.     The WMC4 monthly Investor Reports provides only recent delinquency information to investors. For example, the November 2012 Report provides detailed delinquency information only for the previous 13 months.[19]

19.     In summary, S&P used a 24-month lookback period, the WMC4 Prospectus Supplement used a 12-month lookback, and the Investor Reports used a 13-month lookback. This demonstrates that RMBS market participants attach little, if any, value to delinquency information that is six years old.

## V.   The Objector's "Comparable" Analysis

20.     The Objector claims that "[t]he delinquency rates disclosed in that [January 2007] Investor Report were exactly what investors would have expected given the type of collateral—subprime loans originated by WMC Mortgage—in the Trust."[20] They base this claim on a

---

[17] **Exhibit 3**, at 9.
[18] Pros. Supp. 73/250.
[19] Nov. 2012 Report, at S4-S9.
[20] Obj. 10.

8

comparison of delinquency rates reported in the prospectus supplements and first investor reports for three "similar" trusts: JPMAC 2006-WMC3 ("WMC3"), MABS 2006-WMC4 ("MABS"), and SABR 2006-WM4 ("SABR").

21.     For this argument to hold, the Objector needs to show at least: (i) that the trusts are in fact "similar" and had similar underlying collateral pools, (ii) that the delinquency rates disclosed in the prospectus supplements were comparable across trusts; and (iii) that the disclosed delinquency rates in the first investor reports were also similar. In fact, examination of the "comparable" trusts reveals that they were not similar, that their offering documents disclosed different delinquency rates, and that the delinquency rates in their initial investor reports showed meaningful differences.

        i.     **The WMC3 Trust**

22.     The WMC3 Trust was issued in August 2006, four months before the WMC4 Trust. Relevant pages of the WMC3 Prospectus Supplement are attached hereto as **Exhibit 4**. While the underlying mortgage pools shared certain characteristics, there were also material differences. For instance, whereas the WMC4 pool consisted almost entirely (98.67%) of 30-year mortgages, the WMC3 trust contained a significant percentage (11.21%) of 15-year mortgages.[21]

23.     While the 30-year mortgages in the two trusts had similar interest rates (7.8% and 8.3%) and loan-to-value ("LTV") rates (80.14% and 82.39%), the 15-year mortgages in the WMC3 pool carried a higher average mortgage rate of 11.0% with a higher average LTV of

---

[21] Compare Pros. Supp. 34/250 - 35/250: Table Original Term, with **Exhibit 4**, at S-28: Table Original Term.

9

98.74%.[22] Because both high interest rates and high LTV are considered risk factors, it is far from clear that the risk profile of these pools were "similar."

24. Delinquency rates for the two trusts are also insufficiently similar. Delinquency rates in the WMC3 trust Group 2 loans increased over the first month from 1.11% to 4.04%, that is, a change of 2.93%. According to the Objector, delinquency rates in the WMC4's Group 2 loans increased from 0.05% to 4.67%, that is, a change of 4.62%.[23] An RMBS investor would presumably have viewed WMC4's 4.62% increase in delinquency rate – which was one and half times greater than the increase in WMC3's delinquency rate – as greater cause for concern. This would be particularly true of investors in the M-9 tranche of the WMC4 Trust, who would have started sustaining losses after losses exceeded the Trust's credit enhancement of approximately 4%.[24]

       **ii.**    **The MABS Trust**

25. The MABS Trust was issued in November 2006. Relevant pages of the MABS Prospectus Supplement are attached hereto as **Exhibit 5**. Again while the MABS pool bore certain similarities to the WMC4 pool, it appears to have had a materially different loan portfolio. Like the WMC3 trust, the MABS Trust had a lower percentage of 30-year fixed rate loans, and a higher percentage of 15-year mortgages with high interest rates and high LTVs, as

---

[22] Ibid.

[23] Obj. 10. The delinquency rates used by the Objector in some instances differ slightly from the rates reported in the WMC4 monthly Investor Report. See Zhou Decl. ¶¶ 3-5 (describing methodology for determining delinquency rates).

[24] For further discussion on this point, see paragraphs 32-33 below.

compared to WMC4.[25] Perhaps more importantly, 90% of the mortgage loans in the WMC4 Trust had a credit rating of AA; in the MABS Trust, only 51% of the loans were rated as high.[26]

26.    Because the MABS pool appears to have been materially riskier than the WMC4 pool, an RMBS investor may have been surprised to see in the first WMC Investor Report that the delinquency rate for Group 2 loans was 4.67%, versus 3.98% for the MABS trust.[27]

27.    The Objector also fails to note that the MABS prospectus disclosed that 6.33% of the mortgages in the MABS pool had at least one historical delinquency, and more than half of these had multiple delinquencies.[28] The WMC4 Trust in contrast claimed that only 0.04% were delinquent and that no other loans were or had been delinquent in the previous 12 months.[29] Thus, WMC4 investors were led to believe that the mortgages underlying the deal were essentially pristine, while MABS investors had been informed that a significant proportion of loans had experienced a prior delinquency. Even if the mortgage pools had been otherwise similar, WMC4 investors might have been surprised to learn that delinquencies at the time of the first Investor Report exceeded delinquencies in the MABS pool.

---

[25] **Exhibit 5**, at 31: Table Original Terms to Maturity of the Mortgage Loans.

[26] Compare Pros. Supp. at 39/250: Table Credit Grade; with **Exhibit 5**, at 33-34: Table Credit Grade of the Mortgage Loans.

[27] Obj. 10.

[28] **Exhibit 5**, at 41. The Objector notes that the MABS Prospectus Supplement does not report 30+ days' delinquency information, but then assumes that there are "zero delinquent loans on the cut-off date." Obj. 10 n.10. The Objector does not explain the basis for this assumption.

[29] Pros. Supp. 66/250 – 67/250.

### iii. The SABR Trust

28. The SABR Trust was issued in December 2006. Relevant pages of the SABR Prospectus Supplement are attached hereto as **Exhibit 6**. It too involved a higher proportion of 15-year mortgages with high mortgage interest rates and high LTVs.[30]

29. Unlike the WMC4 and the MABS trust, the SABR prospectus made no disclosure about historical delinquencies or the credit grade distribution of the underlying portfolio. It is thus unclear whether investors thought they were getting a highly rated pristine pool or a pool containing mortgages with lower credit grades and prior delinquencies. According to the Objector's own calculations, the first investor report for SABR showed only a 3.28% delinquency rate versus 4.67% for WMC4's Group 2 loans.[31] In other words, the SABR Trust may have consisted of a loan pool with worse characteristics than WMC4, did not claim that the portfolio was pristine in terms of historical delinquencies, and yet had a lower disclosed delinquency rate in its first investor report. It is unclear that investors would have viewed WMC4's higher delinquency rate as "in line" with expectations in light of these facts.

## VI. Price Impacts in the Mezzanine Certificates

30. In support of its argument that the first Investor Report did not provide investors with useful information about the early delinquencies in the WMC4 Trust, the Objector argues that prices did not move much in early 2007.[32]

---

[30] **Exhibit 6**, at 117.

[31] Obj. 10.

[32] Citing my first declaration, the Objector claims that "even the Commission concedes that, as of the date of the first Investor Report, the Certificates still held an indicative price equal to par, confirming that the delinquency rates reflected were not higher than expected." Obj. 9 (footnote omitted). In fact, the cited statements from my first declaration concerned only Senior Certificates, not Mezzanine Certificates. Canjels 1st Decl. ¶ 26.

31.     Prices for Mezzanines tranches did in fact react quickly to the information disclosed in the early Investor Reports. Mr. Zhou's declaration shows that by March 30, 2007, in just three months, the M-8 tranche had already lost 8.5% of its value.[33] Mr. Zhou's declaration relies upon IDC pricing data. IDC does not provide pricing data for the M-9 tranche. Capital IQ, another source of pricing data, does provide pricing data for the M-9 tranche dating back to February 2007. By March 30, 2007, the M-9 tranche had already lost 24.4% its value. Capital IQ prices for February and March 2007 for this tranche are attached hereto as **Exhibit 7**.

32.     This reaction by Mezzanine investors makes sense. A standard way to think about the risk for the Mezzanine Certificates is to consider their attachment and detachment points. The attachment point is the amount of losses that the collateral can suffer before the certificate starts to take losses. For M-9, the attachment point was approximately 4%. The detachment point is the amount of losses at which the entire tranche would be written off, which for M-9 was approximately 5%.[34]

33.     Thus, M-9 investors would have been especially concerned about collateral losses reaching 4%, as their entire investment would quickly be written off if losses exceeded that level. The fact that prices in the Mezzanine tranches dropped so quickly after issuance confirms that the Mezzanine certificate holders were highly sensitive to delinquency information.

## VII.   The Perceived Risk of the Mezzanine Certificates

34.     The Objector argues that Mezzanine investors knew that they were taking on increased risk in exchange for a higher rate of return. In the case of investors in the M-9 tranche, the Objector argues that such investors should have expected to be exposed to 25 times the risk

---

[33] Zhou Decl. ¶ 8.

[34] The attachment and detachment points are calculated from the Certificates' Original Principal Amounts and the Initial Aggregate Outstanding Principal Balance. Pros. Supp. 6/250, 7/250, and 15/250.

13

of the A-2 tranche because the M-9 credit spread was 25 times greater than the A-2 credit spread.[35] This simple calculation does not accurately reflect the level of risk that early investors in the Mezzanine tranches would have perceived at the time of their investments.

35. The Mezzanines Certificates were considered to be reasonably safe by initial investors. While the Objector focuses only on the lowest Mezzanine tranche (M-9), it is noteworthy that the highest Mezzanine tranche (M-1) in fact received a *lower* credit spread than the one Senior Certificate class (A-1B), and a credit spread that was only 1 basis point (0.01%) more than the another Senior Certificate (A-5). Interest rates for lower ranked Mezzanine Certificates gradually increased from 0.22% to 2% over Libor.[36] While the Objector makes much of the fact that 2% is 25 times greater than 0.08%, in fact, a 2% spread over Libor is not a large premium. The average real stock market risk premium is estimated to be around 5%. In other words, at the time of offering, even the M-9 Certificates were considered to be significantly safer than the overall stock market.

36. The ratings for the offered Mezzanine tranches ranged from AA+ to BBB.[37] S&P's descriptions of the ratings indicate that none of these certificates were considered highly risky or speculative. For example, the M-1 Certificate received an AA+ rating by S&P, which according to S&P meant that it "should be able to withstand a severe level of stress and still meet its financial obligations. Such a scenario could include GDP declines of up to 15%, unemployment levels of up to 20%, and stock market declines of up to 70%."[38] As for the M-9

---

[35] Obj. 14.

[36] Pros. Supp. 7/250.

[37] Pros. Supp. 6/250 – 7/250.

[38] S&P, Understanding Standard & Poor's Rating Definitions, June 3, 2009, at 14, which is attached hereto as **Exhibit 8**.

tranche, which was rated BBB, before the financial crisis, the default rates for BBB securities had never exceeded 1%.[39]

I declare under penalty of perjury that the forgoing is true and correct.

Eugene P. Canjels

Executed on this 7th day of June, 2017 in Washington, D.C.

---

[39] Id. at 9.