UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>J.P. MORGAN SECURITIES LLC, *et al.*,<br><br>Defendants. | Civil Action No. 12-1862 (JEB) |

## MEMORANDUM OPINION

When the Securities and Exchange Commission devises a settlement-distribution plan, a court does not consult a looking glass and ask whether it is the fairest of them all. The only question is whether such a plan is sufficiently fair and reasonable, given that investor compensation is secondary to punishment of the wrongdoer. This SEC action arises out of misrepresentations that Defendants J.P. Morgan Securities LLC and related entities made as to the soundness of residential-mortgage-backed-securities (RMBS) offerings. Over the years, misled investors lost hundreds of millions of dollars. The Commission subsequently settled with J.P. Morgan for roughly $75 million and established a Fair Fund to store those assets, preparing eventually to remunerate the victims. An initial distribution plan, however, faced objections from several outside entities, and the Court agreed in part with those dissenters, finding that the SEC had not yet complied with the Judgment's requirement to consult first with the Internal Revenue Service regarding certain tax consequences.

The SEC now tries again. It has since obtained J.P. Morgan's consent to remove the IRS-consultation prerequisite from a Modified Judgment, which the Court has entered. The present

1

Motion proposes a distribution plan that is slightly reformulated as well.  Despite renewed objections, the Court will approve as fair and reasonable that present plan to reimburse initial investors on a *pro rata* basis.

**I.      Background**

Although a full recap appears in the Court's prior Opinion, see <u>SEC v. J.P. Morgan Securities LLC</u>, 2017 WL 44209 (D.D.C. Jan. 4, 2017), it will briefly summarize the facts relevant to the current Motion.  In doing so, it omits a review of the already-resolved portion of this suit against firms related to Defendant Bear Stearns Companies, LLC.

In October 2006, J.P. Morgan purchased around 10,000 subprime residential-mortgage loans from WMC Mortgage Corporation, a mortgage originator.  <u>Id.</u> at *1.  Defendants then packaged those loans into an investment vehicle known as the WMC4 Trust.  <u>Id.</u>

The Trust's ownership interests were arranged into a hierarchy of tranches, ordered by seniority.  <u>Id.</u> at *2.  To parse it more finely, the securities included two parallel, multi-tranche Groups of Senior Certificates and then subordinate Mezzanine Certificates.  <u>See</u> ECF No. 45 (Declaration of Dr. Eugene P. Canjels), ¶ 11.  Individuals could invest at their preferred level, depending on their appetite for risk.  <u>J.P. Morgan</u>, 2017 WL 44209, at *2.  While more junior securities carried a higher monthly rate of return (from homeowners' monthly mortgage payments), investors were generally paid in order of seniority, meaning that in austere times some junior certificate holders might receive nothing at all.  <u>Id.</u>  This setup is sometimes known colloquially as a "waterfall" distribution, though the Court's prior Opinion observed that it was more akin to a "champagne tower," as bottom investors had to wait for top-tier glasses to be filled before receiving any bubbly themselves.  <u>Id.</u>; <u>see</u> Canjels Decl., ¶¶ 10-13.

In setting up the Trust, J.P. Morgan disclosed information via a December 2006 Prospectus Supplement. See ECF No. 49-3 (Declaration of Benjamin Levi), Exh. B (December 15, 2006, Prospectus Supplement). The Supplement stated that no loan was 60 or more days delinquent and that only 4 loans (.04% of loans) were 30 or more days behind, id. at 18, but in actuality, J.P. Morgan had data indicating that those 4 were 60 days late and 623 more were 30 days past due (totaling 7.1% of loans). J.P. Morgan, 2017 WL 44209, at *2; see Compl., ¶ 91. Defendants nevertheless began selling shares in December 2006, grossing roughly $1.8 billion and earning an underwriting fee of almost $2.8 million. J.P. Morgan, 2017 WL 44209, at *2.

Fast forward a few years to 2012. Thanks to widespread homeowner defaults during the financial crisis, the Trust had written down the value of all Mezzanine Certificates — some $300 million — to zero. See ECF No. 45-7 (July 26, 2010, Investor Report). Senior investors had taken hits as well, though to varying degrees. See Canjels Decl., ¶¶ 19-21; ECF No. 51 (Supplemental Declaration of Dr. Eugene P. Canjels), ¶ 7 (noting senior losses of $131 million).

On November 16, 2012, the SEC brought this Securities Act action against J.P. Morgan for its non-disclosures, and Defendants consented to turning over $74.5 million in disgorgement, prejudgment interest, and civil penalties. See ECF No. 1-3 (Proposed Judgment). The consent Judgment — entered January 2013, see ECF No. 3 — mandated that if the SEC proposed compensating investors, it would "use reasonable efforts to confirm with the Internal Revenue Service" the possible tax consequences of distributing funds through the Trust's waterfall structure. J.P. Morgan, 2017 WL 44209, at *3. In March 2014, the Court approved a Fair Fund to hold the forfeited sums, in anticipation of a coming plan. See ECF No. 11 (Fair Fund Order).

Over two years passed before the SEC proposed a Plan. See ECF No. 12-3 (Distribution Plan). Under the Plan, "Eligible Claimants" were persons who had purchased more than $250 in

3

securities prior to the first Investor Report on January 25, 2007, which disclosed some of the concealed delinquencies. J.P. Morgan, 2017 WL 44209, at *4 (citing Plan, ¶¶ 15, 17-18); Canjels Decl., Exh. 5 (January 25, 2007, Investor Report). For those investors, proceeds would be paid not by seniority but *pro rata* — that is, proportional to their total investment. J.P. Morgan, 2017 WL 44209, at *4 (citing Plan, ¶¶ 55-57).

Certain investors who preferred the waterfall distribution objected, and the Court rejected the Plan. It held that, though the SEC had some flexibility as to the distribution method, it had not yet satisfied the Judgment's IRS-consultation requirement. Id. at *6. The Opinion also noted that the Plan seemed to confer a windfall on initial investors who sold before the issuance of the January 2007 Investor Report. Id. at *7. The Court did not, however, opine on whether the Plan was sufficiently fair and reasonable. Id.

The SEC soon offered a workaround. After considering the delay necessary to obtain an IRS letter ruling (six to twelve months), it sought to amend the Judgment to remove that consultation prerequisite. See ECF No. 43 (Motion to Modify), ¶ 6. J.P. Morgan expressed that it held no opposition to the changes. Id., ¶ 18. The Court then entered a Modified Judgment without the IRS provision in April 2017. Id.; ECF No. 47 (Modified Judgment).

The SEC now seeks approval of a revised *pro rata* distribution plan, which is the same as the original but for two tweaks. See Mot., Exh. 1 (Amended Distribution Plan), ¶ 37. First, the Plan no longer compensates initial investors who had already sold their tickets before the January 2007 Investor Report. Id., ¶ 60(a). Second, it introduces a recovery cap so that claimants cannot recoup more money than they actually lost on their securities. Id., ¶ 60(b)-(c). All told, those investors are set to recover a few pennies on the dollar. See Canjels Suppl. Decl., Exh. 2 (Comparison Table of SEC's & Objector's Distribution Plans).

4

One of the previous Objectors — CXA-13 Corporation — renews its opposition.

**II.     Legal Standard**

In securities-law actions, the SEC has traditionally been able to pursue disgorgement and civil penalties as remedies against wrongdoers. See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81-82 (2d Cir. 2006) (Sotomayor, J.) (surveying history). The Sarbanes–Oxley Act of 2002, Pub. L. No. 107-204, in turn, "establishe[s] the ability of courts to create Fair Funds for monies from disgorgement and civil penalties" so that those sums can "be distributed to investors." Cont'l Cas. Co. v. Duckson, 826 F. Supp. 2d 1086, 1097-98 (N.D. Ill. 2011); see 15 U.S.C. § 7246(a). Despite the availability of a Fair Fund as an option, "the primary purpose of the distribution" still is not "compensation of victims" but rather remains "'punishment of the individual violator and deterrence of future violations.'" WorldCom, 467 F.3d at 81, 83 (quoting SEC v. Coates, 137 F. Supp. 2d 413, 428 (S.D.N.Y. 2001)); see Kokesh v. SEC, 137 S. Ct. 1635, 1644 (2017); H.R. Rep. No. 101-616 (1990).

A court examines a proposed distribution structure with this baseline understanding that investor compensation is only a "secondary goal." WorldCom, 467 F.3d at 81 (quoting SEC v. Fischbach Corp., 133 F.3d 170, 174 (2d Cir. 1997)). "Some disgorged funds [may be] paid to victims; other funds [may be] dispersed to the United States Treasury." Kokesh, 137 S. Ct. at 1644. Courts may thus, within their discretion, approve a plan so long as it "proposes a fair and reasonable allocation of recovered funds to investors." SEC v. E-Smart Techs., Inc., 139 F. Supp. 3d 170, 193 (D.D.C. 2015) (emphasis added); see WorldCom, 467 F.3d at 85.

Some investors will invariably be excluded. The SEC may "engage in the 'kind of line-drawing [that] inevitably leaves out some potential claimants.'" WorldCom, 467 F.3d at 83 (quoting SEC v. Wang, 944 F.2d 80, 88 (2d Cir. 1991)); see SEC v. CR Intrinsic Investors, LLC,

5

164 F. Supp. 3d 433, 435 (S.D.N.Y. 2016) ("[N]early every plan to distribute funds obtained in an [SEC] enforcement action requires choices to be made regarding the allocation of funds between and among potential claimants within the parameters of the amounts recovered.").

In short, "it is 'within the court's discretion to determine how and to whom the money will be distributed.'" Kokesh, 137 S. Ct. at 1644 (quoting Fischbach, 133 F.3d at 175). "[U]nless the consent decree specifically provides otherwise[,] once the district court satisfies itself that the distribution of proceeds in a proposed SEC [distribution] plan is fair and reasonable, its review is at an end." Wang, 944 F.2d at 85 ; see SEC v. Levine, 881 F.2d 1165, 1181 (2d Cir. 1989) ("Once the judgment consented to has been entered as the judgment of the court, the court is by and large required to honor the terms agreed to by the defendant.").

**III.    Analysis**

The SEC's Amended Plan is to distribute the Fair Fund proceeds *pro rata* to initial WMC4 Trust investors.  From its perspective, J.P. Morgan's "misrepresentations and omissions at the time of offering[] in the . . . prospectus supplement" prevented individuals from making educated investment decisions.  See Mot. at 8.  As the non-disclosures ostensibly affected all initial purchasers, the SEC believes that proportional distribution is fair and reasonable.  Id.

CXA voices several objections this time around.  First, *pro rata* distribution ignores the waterfall prioritization that is "fundamental to the structure, value and risk of the Certificates." Obj. at 8.  Second, its temporal limit on Eligible Claimants is arbitrary.  Id.  Third, the recovery cap is flawed.  The Court separately addresses each.

   A. Payment Priority

The Objector first argues that the *pro rata* Plan "ignores the fundamental bargain that lies at the heart of this trust" — namely, that Senior Certificates are paid before Mezzanine

Certificates. Id. at 13. Who is paid first certainly does matter: While the SEC has recouped $75 million, Senior Certificates have presently lost around $250 million, and the $300 million value of Mezzanine Certificates has been entirely wiped out. See ECF No. 49-1 (Declaration of Aleck Zhou), ¶ 7; July 2010 Investor Report. The Objector contends that because junior investors already "are compensated for the risk of not being paid" — via a higher rate of return — they should be paid last. See Obj. at 14. It thus proposes that any distribution should be made "first to Senior Certificateholders" and then to Mezzanine ones "[i]f any funds remain." Id. at 22. Given the numbers involved, the proposal would likely cut junior members out of the recovery pool completely. See Canjels Suppl. Decl., Exh. 1 (Table of Objector's Distribution).

To start, courts need not strictly adhere to the underlying investments' priority structures. There is "no indication in the Fair Fund provision" that the SEC must abide by the underlying "claim priorities when developing a distribution plan." WorldCom, 467 F.3d at 84-85 (rejecting objection that "bondholders" had priority over "shareholders"); see SEC v. Cobalt Multifamily Inv'r I, LLC, No. 06-2360, 2009 WL 1808980, at *4 (S.D.N.Y. June 24, 2009) (similar). Courts do not need to endorse investor attempts "to assert a superior claim to the . . . res so that they can recoup their entire investment." SEC v. Byers, 637 F. Supp. 2d 166, 176 (S.D.N.Y. 2009).

The Objector argues, however, that bifurcating the Senior and Mezzanine tranches rests on real differences between the classes' risk appetites and payment expectations. The logic here is fuzzy. First, not all junior investors were more prepared for the possibility that their securities would not pan out. Indeed, the highest Mezzanine tranche carried a similar interest rate to two lower Senior ones. See Prospectus Supplement at 93-94 (showing .23% and .21% for A-1B and A-5 Senior Certificates, respectively, and .22% for M-1 Mezzanine Certificate). Second, even if payment order should strictly reflect *ex ante* risk allocation, then the solution would not be to

7

first pay <u>all</u> senior investors *pro rata*, as the Objector proposes.  <u>See</u> Obj. at 22.  Senior Certificates are split into two parallel Groups of tranches.  <u>See</u> Canjels Decl., tbl.1.  By CXA's own reasoning that those who risked more should be rewarded last, however, only the <u>top-most</u> tranche of each of those two Groups should receive <u>any</u> money.  <u>Id.</u>, Exh. 4 (Table of SEC's *Pro Rata* Distribution) (showing how A-1A and A-2 tranches, atop Groups 1 and 2 respectively, have unallocated losses totaling over $80 million).

  A more fundamental economic point follows.  The Objector's *ex ante* risk-allocation analysis ignores that this is an action about securities fraud that undermined aspects of the initial bargain.  <u>See</u> <u>Byers</u>, 637 F. Supp. 2d at 176 (rejecting prioritization by "level of risk" in fraud case).  While Mezzanine investors were promised a higher rate to balance out the odds of non-payment, it does not follow that the Trust's tiered structure also reflected the possibility that J.P. Morgan was distorting the overall risk <u>differently</u> between Senior and Mezzanine Certificates.  <u>See</u> <u>SEC v. Enter. Tr. Co.</u>, No. 08-1260, 2008 WL 4534154, at *2 (N.D. Ill. Oct. 7, 2008) (approving layered distribution plan only where there were different risks "explicitly assumed").  Put another way, junior tranches received higher potential monthly returns to reflect their susceptibility to usual market forces such as GDP declines, unemployment spikes, and stock-market crashes, <u>not</u> some comparatively greater vulnerability to fraud in the seller's initial offering documents.  <u>See</u> Canjels Suppl. Decl., ¶ 36; <u>id.</u>, Exh. 8 (S&P Ratings Definitions) at 14.  CXA presents no evidence that Mezzanine rates of return were specifically structured to compensate for potential non-disclosures.  <u>Cf.</u> James J. Park, <u>Shareholder Compensation as Dividend</u>, 108 Mich. L. Rev. 323, 341 (2009) (noting investors, in theory, could ask "to pay less for the share of any company because of the possibility of fraud").

Even if the Objector's alternative makes some sense, the Amended Plan's proportional scheme is still a fair and reasonable one. "Courts have favored *pro rata* distribution of assets where, as here [with J.P. Morgan], the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88-89 (2d Cir. 2002). As to that second prong, courts ask whether investors "were similarly situated in relationship to the fraud, in relationship to the losses, in relationship to the fraudsters, and in relationship to the nature of their investments." CFTC v. Walsh, 712 F.3d 735, 750 (2d Cir. 2013). The Court has discussed already how the differentiated nature of the Certificate tranches is less significant a consideration in this case, and so it focuses its analysis on the other factors. See id. at 748 (affirming district court that reasoned, "[W]hat defines the scheme [is] not the nature of the investments.").

Significant here is that each initial investor, regardless of seniority, bore a similar relationship to J.P. Morgan and its conduct. Defendants misstated the soundness of the Trust's mortgages, caused individuals to adopt a greater risk than they bargained for, and made their non-disclosures "uniform[ly]" across all investors. Id. at 750. To reprise the "champagne tower" analogy, it would be as if J.P. Morgan had advertised champagne of the French varietal when its bottle held only sparkling wine; regardless of placement in the tower, all flute holders would be let down. It suffices here that the SEC is broadly recompensing the audience of the deceit. See In re Reserve Fund Sec. & Derivative Litig., 673 F. Supp. 2d 182, 197 (S.D.N.Y. 2009) (noting it is "difficult, if not impossible," to parse out those actually swayed by misstatements).

One last offshoot tendril from the main grapevine needs pruning. CXA contends that the "undisclosed delinquencies had no real impact on the Mezzanine Certificates," as a few hundred performing loans would not have rescued the junior echelons from the impending financial crisis

9

regardless.  See Obj. at 14; see July 2010 Investor Report at 2.  In an enforcement suit, however, "the SEC need not prove actual harm" (and does not seek to do so here).  SEC v. Familant, 910 F. Supp. 2d 83, 92 (D.D.C. 2012) (quoting Graham v. SEC, 222 F.3d 994, 1001 n.15 (D.C. Cir. 2000)).  The Commission instead rightfully focuses on those persons deciding to invest in the first place.  See Pommer v. Medtest Corp., 961 F.2d 620, 623 (7th Cir. 1992) (holding that while good or bad "fortune may affect damages, . . . it does not make the falsehood any the less material").  Here, as Defendants' conduct affected all initial purchasing decisions, *pro rata* disbursement is a fair and reasonable way to proceed.

    B.  Eligible Claimants

CXA next objects that the Commission's definition of Eligible Claimants is arbitrary.  See Obj. at 8.  The SEC's Plan limits recovery to investors who purchased certificates before January 25, 2007 — the date of the first Investor Report — and then held onto those securities at least through that date.  See Amended Plan, ¶¶ 17-18, 60(a).  The Objector alleges, however, that J.P. Morgan's "misrepresentations did not come to light until the Commission filed its complaint in this case on November 16, 2012," and opposes "[u]sing any date prior."  Obj. at 12, 18.

Determining a cutoff date is quintessential "line-drawing" appropriately left to the discretion of the Commission.  Wang, 944 F.2d at 88.  While the Objector is correct that investors did not understand the full extent of J.P. Morgan's non-disclosures in January 2007, those initial misrepresentations surely had less and less effect on individuals' investment decisions as the first months went by.  By November 2012, it would have been downright foolish for any person to look to the original Prospectus Supplement for substantial guidance.

A timeline underscores this.  To recap, in December 2006, the Prospectus Supplement incorrectly disclosed that only 4 mortgages (.04% of the pool) were 30 or more days late when in

fact 4 loans were 60 days past due and 623 were 30 days late (bringing total delinquencies to 7.1%). J.P. Morgan, 2017 WL 44209, at *2. The initial monthly Investor Report of January 25, 2007, first cast doubt on this rosy scenario. It disclosed that, of the Trust's two loan bundles, 93 Group 1 and 253 Group 2 loans were 30 days late, resulting in respective delinquency rates of 2.94% and 4.64%. See January 2007 Investor Report at 8; Zhou Decl., Exh. A (Table of Monthly Delinquency Rates) at 2 (giving numbers of 3.16% and 4.67%). The market internalized this within weeks, as even before the next monthly report, the bottom-most Mezzanine shares had lost around 17% of their value. See Canjels Suppl. Decl., Exh. 7 (M-9 Certificate Prices). Armed with more data, investors entering the fray after January 25, 2007, would have realized that the Trust was not the squeaky-clean RMBS vehicle advertised in the Prospectus Supplement, but would have instead understood that it had nearly 350 delinquencies.

By February 26, 2007, reported delinquency rates had nearly doubled to 4.51% for Group 1 and 8.09% for Group 2. See Table of Delinquency Rates at 2. The Court's back-of-the-envelope arithmetic reveals that those percentages would bring the number of late loans to around 680. See January 2007 Investor Report at 8 (calculated by comparing January 2007 ratios). Following that February report, the most junior tranche lost some 20% of its value. See M-9 Certificate Prices. And while March 2007's delinquencies diminished slightly (to 3.77% and 7.06%), this mild reprieve did not slow the bleeding. Id.; see Table of Delinquency Rates (showing M-9 tranche lost nearly 25% by end of March); Zhou Decl., ¶ 8 (showing all but two Mezzanine classes losing several percentage points). Surely at that point it would have been pure fantasy for a person to invest thinking that the Trust held only four delinquent loans.

With the financial crisis in full swing, some senior investors stopped receiving payments on loan principal in November 2007. See Canjels Decl., ¶¶ 18-19. In July 2010, junior shares

were reduced to zero.  By November 2012, 38% of the original balance (some $131 million) was gone, and of the remaining loans nearly half were delinquent.  See Canjels Suppl. Decl., ¶¶ 5-6.

Considering how events unfolded, the Objector's insistence of November 16, 2012, as the only reasonable cutoff date misses the mark by several years.  By that time, a bevy of more recent market data had supplanted the Prospectus Supplement, which was then almost six years old.  See Lord Abbett Mun. Income Fund, Inc. v. Asami, No. 12-3694, 2014 WL 3417941, at *11 (N.D. Cal. July 11, 2014) (holding "superseding information" from two later reports made 2007 offering memorandum "stale as a matter of law by 2010"); Grynberg v. BP, P.L.C., No. 06-6494, 2011 WL 1161540, at *11 (S.D.N.Y. Mar. 30, 2011) ("[I]t does not stand to reason that [a company] would invest billions of dollars on the basis of six-year old information in its files.").

Granted, there may have been no single watershed event in the interim.  But it is reasonable for the SEC to think that the January 2007 Investor Report's exposing of nearly 350 delinquent loans sounded the alarm that the front-end numbers were not reliable.  Or it might be the case, instead, that the wakeup call occurred in February 2007, when investors learned that roughly 680 were past due.  See Table of Delinquency Rates at 2.  All said, arguments can be lodged in favor of any sufficiently early date.  Solomonic line-drawing based on financial data, however, is a matter within the Commission's "area of expertise."  WorldCom, 467 F.3d at 83; see Wang, 944 F.2d at 88.  The SEC has applied its know-how by deducing that — because loan "information quickly becomes stale as more current information becomes available in subsequent Investor Reports" — a January 2007 date is sensible.  The Court agrees.

Even if later investors are somewhat harmed, moreover, the SEC is allowed to focus on "the most grievously injured claimants" at the expense of those "other investors."  WorldCom, 467 F.3d at 84 (quotation omitted).  Limits are inevitable because the government did not recoup

some endless wellspring of funds. Id. ("When funds are limited, hard choices must be made.") (quotation omitted). The Commission here faced "a choice between either expanding the class" (beyond January) — thus lowering individual recovery — or "narrow[ing] the definition" (to January). Wang, 944 F.2d at 87. It soundly chose the latter. Because the earliest investors were those who made decisions based to a greater extent on the Prospectus Supplement and not some later Report, the compensation of those most directly affected is fair and reasonable.

The Objector's final contention also gains no yardage. CXA makes much of three other RMBS trusts' performance in the late 2000s to show that "the delinquency rates in the WMC4 January 2007 Investor Report did not reflect any aberration or unusual circumstances." Obj. at 10. First off, the point is not to measure when precisely the full details of Defendants' conduct was revealed, but to ascertain a reasonable point in time when non-disclosures had significantly less effect on new investment decisions. Second, in an economy where trillions of dollars of residential loans have been securitized, picking out three other trusts — without explaining how they were selected — is hardly probative. See Adam J. Levitin & Tara Twomey, Mortgage Servicing, 28 Yale J. on Reg. 1, 17 (2011) (showing RMBS market). Third, the SEC shows compellingly that the three other trusts were riskier due to higher interest rates and loan-to-value ratios on shorter-term loans, making their faults less notable to investors than this Trust's decline. See Canjels Suppl. Decl., ¶¶ 22-29. In sum, the Court finds that the January 25, 2007, date is fair and reasonable.

    C.  Recovery Cap

The Objector briefly raises two final points as to the recovery cap. To explain, some groups of early investors — for instance, those lucky ones who sold before the financial crisis or other who hold the most senior securities — might not have lost much on their Trust investments

at all.  See Comparison Table.  The SEC seeks to prevent a windfall to these individuals by limiting recoupment to the actual losses on their certificates.  See Amended Plan, ¶¶ 60(b)-(c).  Neither of the two issues with this cap detains the Court long.

First, CXA argues that the SEC will not be able to determine the prices of (and, hence, losses on) Trust securities, which are not exchange traded.  See Obj. at 19-20.  As the Commission explains, however, it uses the same common pricing provider that the Objector relies on.  See Reply at 16 n.14 (referencing Zhou Decl., ¶ 8).  Second, as to the narrower subset of still-invested individuals, CXA instead proposes capping recovery at the present amount of losses as opposed to present and expected future losses in income.  See Obj. at 15 & n.13.  On this score, the SEC's inclusion of expected losses is sensible; with the underlying mortgages in such disrepair and only a fraction of loan payments trickling in, it is virtually assured that current certificate holders will miss out on future monthly payments.  See Canjels Suppl. Decl., ¶ 4 (noting foreclosures and bankruptcies "virtually guarantee[] . . . additional losses"); Zhou Decl., ¶¶ 6-7 (describing increase in losses from 2012 to present, even years after financial crisis).

\* \* \*

In sum, the Court rejects CXA's objections to the Amended Plan's *pro rata* payment priority, restriction to initial investors, and recovery cap and finds it to be fair and reasonable.

### IV. Conclusion

For these reasons, the Court will grant the SEC's Motion and approve its Amended Plan.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  July 20, 2017